UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FOOD MANAGEMENT GROUP, LLC, | : | Case No. 04 B 22880 (ASH) |
| KMA I, INC., | : | Case No. 04 B 22890 (ASH) |
| KMA II, INC., | : | Case No. 04 B 22891 (ASH) |
| KMA III, INC., | : | Case No. 04 B 22892 (ASH) |
| BRONX DONUT BAKERY, INC., | : | Case No. 04 B 20312 (ASH) |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| FOOD MANAGEMENT GROUP, LLC, | : | |
| KMA I, INC., KMA II, INC., | : | |
| KMA III, INC., | : | |
| and BRONX DONUT BAKERY, INC., | : | |
| | : | |
| Plaintiffs, | : | Adv. Proc. No. 05-8636A |
| | : | |
| -against- | : | |
| | : | |
| MATRIX REALTY GROUP, INC., | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER**
**DENYING MOTION FOR RECUSAL**

By notice dated June 6, 2006 defendant Matrix Realty Group, Inc. ("Matrix") has made a motion for my recusal and has requested an order shortening time to schedule a hearing on the motion. Rather than scheduling a hearing, I shall deny the motion forthwith for the reasons set forth below, in order to afford Matrix' counsel the opportunity to present the matter to the District Court if so advised before the trial in this adversary proceeding scheduled to commence June 16.[1]

---

[1] The adversary proceeding has been pending since May 2005. In April 2006 Matrix moved for summary judgment and the Chapter 11 Trustee cross-moved for summary judgment, both contending that there were no material issues of fact in dispute and that the adversary proceeding was ripe for final adjudication. The cross-motions were argued May 4. I concluded that there may be issues of fact requiring a trial. Since both sides had fully marshaled the facts and the law, I scheduled the trial for June 16. It is essential to these two-year old Chapter 11 cases to resolve the issues with Matrix promptly and, if the adversary proceeding is not tried as scheduled, it may be difficult or impossible to schedule the trial until September or October.

Recusal is sought based on remarks I made in open court on three occasions which Matrix argues "appear to the reasonable person to rise to a level that at the very least give the appearance of impartiality [sic — presumably read "partiality"]." Each of the three will be addressed.

**November 23, 2005**

The November 23 hearing concerned a number of matters not involving Matrix, which was not represented at the hearing. The colloquy which Matrix complains of occupies less than two pages (Tr. 37-39) in a 41-page transcript.

In that colloquy the Chapter 11 Trustee informed the Court that she had reached a settlement with Matrix (the "Matrix Settlement") in which she would return the Matrix contract deposit of $2,400,000 and dismiss this Adversary Proceeding in which the debtors seek to retain the $2,400,000 deposit and recover substantial damages[2] for breach of contract. After describing the settlement, the Chapter 11 Trustee stated "I was hoping, Your Honor, that I could submit a proposed order and put it in presentment," which would mean that the Trustee would not submit a motion with supporting papers setting forth the material facts and explaining the justification for the Matrix Settlement.

I responded to the Chapter 11 Trustee by rejecting her request to proceed by a simple notice of presentment without supporting papers, and in the colloquy that ensued (Tr. 38-39) I explained why I would require the Trustee to expend the time, effort and cost to the debtors' estates of preparing full motion papers by stating:

---

[2] Matrix and the debtors executed a contract dated as of April 15, 2005, under which Matrix agreed to purchase the debtors' assets for a purchase price of $26,770,000. The debtors ultimately sold their assets to another purchaser for $18,000,000 with price reduction clauses which will result in substantially lower proceeds to the estates.

- 2 -

>THE COURT: No, I think you'd better make a motion.
>
>\* \* \*
>
>THE COURT: I could foresee creditors objecting to the settlement and requiring a full illumination given the particular facts here involving Matrix' repudiation of the agreement.
>
>\* \* \*
>
>THE COURT: Yes. Because it may be very significant to the creditors. I mean the deposit is a significant issue.
>
>\* \* \*
>
>THE COURT: You're talking about a lot of money that could render an insolvent estate fully solvent.
>
>\* \* \*
>
>THE COURT: . . . [I]t is a motion which I would be surprised if some creditors did not object to given the fact that creditors are quite likely not going to be paid in full and I would think, for example, that the principals here might object since it may effect litigation against the principals but, anyway, I'll hear the motion.
>
>It may be that it's provident and it may not be. I don't know.
>
>MS. GRUBIN: Thank you, Judge.
>
>THE COURT: I always abide the event on matters that might be contested.[3]

Matrix has objected to my statement at the November 23 hearing in the following passage at pages 3-4 of its motion:

>In essence, the Court was doing more than ruling on any motion before it. Rather it was advocating a position. It was suggesting to parties represented by sophisticated counsel that it was prepared to entertain certain motions and objections given the posture of the case. Further, it stated that Matrix repudiated the contract. The Court did not state that Matrix allegedly repudiated the contract, it did not state that it had been alleged that Matrix had repudiated the contract. Rather, the Court stated as a matter of fact that Matrix repudiated the contract. That issue is an open issue that must be determined in the pending adversary proceeding.

---

3   It should be noted that the Chapter 11 Trustee was not appointed until September 2, 2005, after the hearing on June 29, 2005 which is central to the debtors' claims against Matrix and Matrix' defenses, and it appeared to me at the November 23, 2005 hearing that the Trustee may not have been familiar with the events at the June 29, 2005 hearing.

- 3 -

In this colloquy with the Trustee I was not "suggesting" that I would entertain certain motions — I was instructing the Trustee that I would not permit her to seek approval of the Matrix Settlement by notice of presentment, and I was ordering that she make a motion on full motion papers and notice to all creditors to explain and justify the settlement. The notion that I was "suggesting to parties represented by sophisticated counsel" that they should file objections to the settlement is ridiculous — these Chapter 11 cases have been uncommonly contentious, and the creditors, the debtors, and the debtors' principals, all of whom have indeed been represented by capable counsel, have never hesitated to litigate any matter of substance. Moreover, it was a certainty that there would be objections which would need to focus on whatever the Trustee might say by way of justification. And finally, even if there had not been objections filed, I would have needed sound reasons from the Trustee to approve the Matrix Settlement which, on its face, was not a settlement but a capitulation with no discernible *quid pro quo*.

Matrix' basic objection is that "the Court stated as a matter of fact that Matrix repudiated the contract." The problem with this objection is that Matrix' repudiation of the contract is a matter of undisputable fact recorded in the transcript of the hearing in this Court on June 29, 2005. At the June 29 hearing, the principal agenda item was the debtors' objection to the validity of Dunkin' Donuts' rejection of Matrix as a franchisee based on the dishonest conduct of an individual named Krischer who was proffered by Matrix as a principal who would manage the Dunkin' Donut franchises. Rather than supporting the debtors' effort to win approval of their contract with Matrix over Dunkin' Donuts' objection, Matrix sought to persuade the Court not to proceed with the June 29 hearing by declaring unambiguously that the issue was moot because, regardless of the outcome, Matrix did not intend to perform the contract. Matrix was represented at the June 29 hearing by its attorney, Mr. Kera, and one of its two shareholders and principals, Mr. Nieto. Mr. Kera made the following statement (Tr. 18):

> MR. KERA:   Matrix is here, Mr. Nieto is here and I think there's one significant issue that I think the Court should be aware of.
>
> THE COURT:   All right.
>
> MR. KERA:   Matrix is not interested any further in pursuing this offer.   They feel there have been a lot of misrepresentations on the stores that are available and financials.   So it's kind of irrelevant whether Mr. Chrischia [sic] is acceptable or not because they just did not want to pursue this deal any further.

After colloquy between the Court and other counsel in which I concluded that "right now it's not moot even if Matrix is going to declare that it's not going forward" (Tr. 22), the following statements were made by Messrs. Kera and Nieto (Tr. 22-23):

> MR. KERA:   Your Honor, this is Richard Nieto.   He's just appeared.   He's an attorney also.   He's one of the principals of Matrix.   He'd like to be heard.
>
> THE COURT:   Why don't I get your name.
>
> What is your name?
>
> MR. NIETO:   Richard Nieto, N-I-E-T-O.
>
> I'm a principal of Matrix as well as an attorney in New York.
>
> THE COURT:   Okay.
>
> MR. NIETO:   I've been very familiar with this from a financial standpoint as well as on a legal basis.   I was involved in depositions last week at Mr. Rattet's office.   I was also involved in some meetings that [sic] Mr. Rattet's office before we had put the offer in.
>
> I mean it's clear that there are many and multiple misrepresentations and inaccuracies in a verbal way as well as in an offering memorandum
>
> The defendants have approached us to try to renegotiate over towards renegotiating the sales price.   For example, like the Taco Bell guy who was just here — the attorney — that was in issue with respect to things that are listed that we're not going to get on a deal, for instance, that particular location.
>
> There's so many, I don't want to get into it right now but it's clear that no one is expecting us to go through with this transaction based on the purchase of sale agreement that was executed two months ago and we feel its [sic] moot to have this big effort as to whether Dansch [Ph.] is properly rejected or not when I think everybody knows we're not being [sic] going through with the deal and that the offering memorandum needs to be revised so that it's accurate so when other people show an interest in this in the future that they're not going to run into the same problems we're running into which is they're going to see issues and they're going to not want to go through with it.

These statements by Matrix' counsel of record and its principal that Matrix did not intend to proceed with its contract with the debtors regardless of the outcome of the June 29 hearing on Dunkin' Donuts' objection to Krischer was unambiguous and unequivocal.  Thus, Matrix' repudiation of the contract at the June 29 hearing was not "an open issue that must be determined in the pending adversary proceeding," and my reference to Matrix' repudiation of the contract at the November 3, 2005 hearing did not reflect either a lack of impartiality or prejudgment of the dispute between the debtors and Matrix.  The fact that I had not prejudged the impending controversy between the debtors and Matrix is reflected in the June 29, 2005 transcript (Tr. 20):

> THE COURT:  Well, that's true but on the other hand if — I suppose you're right if Matrix were to prevail on the claim that there were misleading statements in the offering circular or whatever and that it should be relieved of its contractual obligation but if it were not to prevail then I suppose that the debtor would be seeking damages from Matrix or at least the forfeiture of the deposit.

The fact that I have not prejudged the outcome of the debtors' dispute with Matrix even now is evident from the fact that I denied both sides' motions for summary judgment and set the case down for trial on June 16.

**March 15, 2006**

The March 15, 2006 hearing served, in part, as an updating pretrial conference in the debtors' adversary proceeding against Matrix.  At that time it appears that cross-motions for summary judgment had been filed.  The following dialogue took place (Tr. 10-11):

> MR. BROOKS:  Correct.  And there's a motion for summary judgment that's been filed by the trustee — by the debtor at the time as well as a cross-motion that is filed by Matrix.  What I would propose if it's —
>
> THE COURT:   I would suggest that you examine, you and Mr. Rosen examine that motion with a view of determining whether or not it's a viable motion either way.
>
> MR. BROOKS:  I've done that.
>
> THE COURT:   It would appear to me that there may be issues of fact that maybe may claim would preclude summary judgment.   Do you have a view, Mr. Rosen?

After Mr. Rosen made comments concluding "So clearly if those motions were to go forward I know I want to retool it and see if it needs to go by," I made the following statement (Tr. 11-12):

> THE COURT:    I haven't read the summary judgment motions at all.  I just — I have, however, a good deal of background in the matter and it would have surprised me considerably if there weren't issues of fact.  I mean, for example, I have a recollection that Matrix asserted at an early stage that it wasn't going forward with the contract because there had been misrepresentations or something of the sort.  That sounds like the stuff of conflicting facts.

Once again, this comment hardly reflects a lack of impartiality or prejudgment of the controversy.

The context of the colloquy to which Matrix objects in the March 15, 2006 pretrial conference was a discussion among the Court, Mr. Rosen representing Matrix and Mr. Brooks representing the Chapter 11 Trustee.  Both Messrs. Rosen and Brooks were new to the case.  The discussion with Mr. Rosen begins at page 11 of the Transcript.   The discussion with Mr. Brooks begins at page 16 of the Transcript.  Both counsel stated their desire to reexamine the existing cross-motions for summary judgment and supplement the motion papers as their review of the record and their understanding of events in the case might dictate.

Matrix quotes a remark which I made at page 18 of the Transcript — "So that will be part of your record" — and asserts that "to the reasonable person looking at the statements from afar, it appears that the Court is advocating a position rather than making decisions about motions or objections before it."  Of course the Court was not making decisions about motions or objections before it — the colloquy took place in the context of a pretrial conference in which counsel and the Court were discussing procedures for cross-motions that counsel for both sides, being new to the case, wished to reconsider and perhaps refocus.  The entire context of the Transcripts reads as follows (Tr. 17-21):

> MR. BROOKS:    Correct — and possibly actually with respect to the damage award which is the larger issue that is the delta between the bid and what was ultimately obtained which was lower.  Now, the damage amount may be a fact issue but maybe liability isn't because I think it's tied.
>
> What I would suggest — I have read the papers.  I would like, although I acknowledge counsel being new to the case and I understand that, I'm fairly new to the case as well, but I've got a little more time.  I would like to file a brief because I think

something more needs to be said to support the motion that's on file and I would like to respond to the cross-motion. So I can do that in one brief.

THE COURT: Is it a brief or — I haven't looked at the motion papers as is my custom. I don't look at those until sometime that's reasonably near the time it's going to be argued because otherwise I'll forget important things. Do you need to refile a motion in terms of what backs it up, et cetera?

MR. BROOKS: I think I could cover it in a brief that would supplement the motion already on file and respond to the cross-motion. I think we could think about —

THE COURT: In other words, the affidavits and exhibits or whatever is annexed as the support for the motion is all there.

MR. BROOKS: I think it is. I think — frankly, I think we're relying on the purchase agreement and the letters from Dunkin' Donuts.

THE COURT: And presumably the transcript because there were statements made —

MR. BROOKS: On June 29.

THE COURT: — on the transcript. In fact, my recollection is, correct me if I'm wrong somebody, Meredith perhaps, but that at the very outset of the hearing before the hearing really got underway on the objection by the debtor to Dunkin' Donuts objection which I ultimately sustained. But at the very outset of that hearing my recollection is that somebody stood up on behalf of Matrix and said this whole thing is moot because we're not going forward anyway.

MR. BROOKS: That's right, Judge.

THE COURT: So that will be part of your record.

MR. BROOKS: Mr. Kera said that.

THE COURT: Right.

MR. BROOKS: And indeed at the end of that transcript it was repeated and that there were merely a couple of questions I think during the hearing that were asked by Matrix's counsel and that's going to be another part of our motion I think because I think it ties in with this whole other issue.

THE COURT: I'm just — I don't know whether that is part of the record on the motion or not.

MR. BROOKS: Then I just want to say — and it's up to Your Honor how you want to schedule this, but I think with respect to the rest of the case if we don't wrap it all into the summary judgment we might want to take some discovery. I'm willing to do that over a sixty-day period.

THE COURT:   Well, your thought though is that discovery isn't necessary and that you'd like to go forward with the cross-motions for summary judgment amplified by both sides and have an argument and — I'm not terribly against that because even if ultimately a motion for summary judgment can't succeed such motions are often helpful in winnowing down the issues which is a significant part of the role of a trial level judge anyway.

Is that your point?

MR. BROOKS:   Yes.

THE COURT:   Mr. Rosen.

MR. BROOKS:   Can I just comment real briefly on the motion to reconsider? Your Honor is well familiar with the standards under 9023 and 9023.1 I think under the local rules.

It's not an opportunity to make another record.  It's when the Court respectfully has overlooked a material fact or overlooked controlling law and that's not a chance to say I want to put all this other stuff in the record.

THE COURT:   All right.

MR. ROSEN:   I understand that, Your Honor, and I think there were some errors of fact to be corrected there in terms of what went on.   In terms of the transcript, I think also there were reasons why that was done and it relates back to the way I interpret the contract and what went on in terms of what my client was obligated to do or not to do under that.

In terms of the summary judgment motion before he responds to it.  I think I should probably refile it because mine will be substantially different.  I mean one of the issues that comes up now when I talk about subsequent facts is I've looked and I haven't finished going through all of it, but it would appear in terms of the misrepresentation claims.  Without getting to the zipper clauses, without getting to all of that, those misrepresentations claims went to what the debtor and eventually the trustee would actually be able to convey.  Our contract is very different from the contract that ultimately closed because our contract only had exceptions where they could give us a cash deduct for I believe three stores that they could not provide.  One of them was the Mauze store which was under litigation.  I'm learning the case.   It's taking a bit.  The other ones were ones where there were questions.

Ultimately, as I understand it, our contract was impossible to perform because the debtor could not have provided to us title to the assets which they absolutely bound themselves to give us.  So that's one of the issues in terms of summary judgment, why I think it has to be retooled and along with some other issues that were not raised.  There's some procedural problems with it also that I would like to fix so it's a proper motion — there really is no such thing as a cross-motion.  It would be a proper motion for summary judgment if we get there if I'm not able to convince you of the proper business judgment of the trustee.

THE COURT:   Is the trustee standing by your 9019 motion and your settlement?

      MS. GRUBIN:   No, Your Honor.

Since the then-pending cross-motions for summary judgment had been prepared by different counsel, both Messrs. Rosen and Brooks as new, incoming counsel wished to reexamine and modify or supplement the motion papers.  There followed further discussion of scheduling at pages 23-28 of the Transcript:

      THE COURT:   I will read it with care.  You must know me that well.

      MR. ROSEN:   I fully expect that, Judge.

      THE COURT:   Okay.  So how much time assuming — which is, let's face it likely that I do not change my mind on disapproving the settlement.  How much time do you want to do a new and different response to the motion for summary judgment and file a different cross-motion?

      MR. ROSEN:   Thereafter to get through all of this and put it together, thirty days.  As you know, I'm —

      THE COURT:   Do you want to supplement the motion at all or is it founded on the transcripts and the other documents that you would rely?

      MR. BROOKS:   I need to supplement it, Judge.

      THE COURT:   How long will it take you to supplement?

      MR. BROOKS:   I can do that within thirty days.

      THE COURT:   No, no, no.  We're stretching on into the dim — I can't even see that far ahead.

      MR. BROOKS:   Well, it would be the same thirty-day period I think that —

      MR. ROSEN:   But he's going to want to see my papers.

      THE COURT:   He has to respond to your motion.  So can you either file a new motion or supplement the one that you've got within ten days?

      MR. BROOKS:   If that's what Your Honor wants me to do, I'll do it.

      THE COURT:   If you can do it.  I mean you've indicated that the motion that really all you wanted to do was to add a brief or change the brief.  Now, what I'm suggesting is that you consider whether you have all the predicates in the motion, exhibits, transcripts, letters, whatever.

      MR. BROOKS:   I think I do.  I think I do, Judge.

THE COURT: Then that should be possible then to do whatever you need to do to get the motion in its final shape within ten days and then you can have twenty days. It's not going to be much different from what it is. Let's face it. You can have twenty days after that to put in a new response.

MR. BROOKS: There's a cross-motion though that's on file.

THE COURT: That's part of what he's going to be dealing with. Right?

MR. ROSEN: I think what counsel is saying in all fairness he wants to have an opportunity to respond to whatever I'm going to put in.

MR. BROOKS: Thank you.

THE COURT: Of course. Of course.

MR. ROSEN: So we brought out another —

THE COURT: You'll have ten days to make the motion, the estates — it was the debtor's now. It's the trustee's motion as good as you want it. You will have twenty days to either amend or make a superseding response and cross-motion. How about that?

MR. ROSEN: That's fine. Then I think counsel needs a chance to respond.

THE COURT: And you will have an additional — how much time? Let's say —

MR. BROOKS: It's going to be new stuff as opposed to what's in there. So I would like more than ten days, sir.

MR. ROSEN: If I get twenty he should get twenty, Judge. I mean —

THE COURT: I can't do that.

MR. ROSEN: Fair is fair.

THE COURT: Fourteen. Let's block this out on a graph because I'm going to set an argument date.

MR. BROOKS: You must think I write faster, Judge.

THE COURT: Ten days for you. I'll make it — we'll put down dates. Don't you think this is the only way to do this? I mean the estate has got to know the outcome of this. Matrix needs to know the outcome of this. It has been — the whole issue has been moldering for an interminable period of time and let's get done with it.

MR. BROOKS: We'll do.

THE COURT: So today is the 15th. Ten days is a weekend. The 27th for you to make definitive motions for summary judgment. Twenty days thereafter —

MR. ROSEN: I lose an hour with daylight savings time.

- 11 -

THE COURT:   The 7th of April, Friday the 7th of April.

MALE VOICE:   That's only ten days, Judge.

MR. ROSEN:   Thank you.

THE COURT:   All right then.

MR. ROSEN:   You get to rule on a weekend, Judge, because that brings it out to April 17th.

THE COURT:   Yes.   April 17th.

MR. ROSEN:   Which looks like it's —

THE COURT:   If you prefer.   Would you prefer the 14th?

MR. ROSEN:   No.

THE COURT:   I was thinking about your weekend.

MR. ROSEN:   Why when I can do it on Easter Monday, Passover and the day after I have to pay the federal government.  Would I want to pass that up, Your Honor?

THE COURT:   April 17th.

[ Pause in proceedings.]

THE COURT:   Two weeks from there would be May 1.

Now, the argument —

MR. BROOKS:   Judge, in thinking — while you're looking for that, I'm thinking if I get a motion, a cross-motion revised or however it looks from counsel —

THE COURT:   It can't be too different.

MR. BROOKS:   Well, but my concern is this that he has affidavits attached to it, et cetera.  I mean I'm concerned about the compression of time.  I may need to take a deposition.  I don't know what he's going to file.  I have no idea but I'm just anticipating that I get some sort of evidentiary submission that —

THE COURT:   Let's see what it is.  Let's see what it is.

MR. ROSEN:   If there is a material evidentiary issue then [inaudible] only getting summary judgment.

THE COURT:   Right.  I think we should have argument on Thursday, May 4th.  How is that?

MR. ROSEN:   Whatever you say, Your Honor.   What time?

- 12 -

   THE COURT: Great idea. Now, let me suggest now as you go through these papers and the putting together of the motion and the cross-motion and the reply that you try to anticipate the likelihood or not of there being issues of fact that would deny judgment, summary judgment, and as you do that you will be plotting your discovery, won't you? You'll be thinking what discovery you need so that — and I really haven't the slightest idea what the outcome will be, but if it should turn out that summary judgment is not appropriate you know at the end of the argument and my ruling I'm going to say how much discovery do you need, you'll know exactly what discovery you need. Forewarned, forearmed and you will also be forearmed with the certain knowledge that if I'm frustrated by my frustrated zeal in deciding the case by the fact that there are issues of fact that require a trial I will impose scheduling order that will be of great rigger but obviously save everybody money in the long run. How about that?

   Now, it may well be that I'll grant the motion but by thinking of discovery as you go along and whether there's a need for discovery really and what you're going to say if I say why do you need so much discovery when you have been arguing that there are no issues of fact.

   MR. BROOKS: I never heard that before, Judge.

   THE COURT: Be prepared. The 4th at 11:00. How is that?

   For counsel for Matrix to suggest that this Court's conduct of the March 15 pretrial conference reflects bias or partiality on the part of the Court is baseless.

   With the possible exception of attorneys Rosen and Brooks, every attorney involved in the case since the June 29, 2005 hearing has known perfectly well that the statements by Messrs. Kera and Nieto at the June 29 hearing lie at the crux of the debtors' claim for breach of contract against Matrix. My statement to Mr. Brooks at the March 15, 2006 conference "so that will be part of your record" was not an instruction to Mr. Brooks that he should include the June 29, 2005 Transcript in his motion papers on behalf of the Chapter 11 Trustee.[4] But if I had intended that statement as an instruction to Mr. Brooks, there would have been nothing improper in it because the controversy between the debtors' estates and Matrix in this adversary proceeding obviously cannot be resolved without reference to what happened at the June 29, 2005 hearing.

---

[4] I do not know at this point and did not know on March 15, 2006 whether the June 29, 2005 Transcript was already included in the summary judgment papers.

- 13 -

**May 30, 2006**

On May 30, 2006 this Court held a hearing on Matrix' motion to stay the trial scheduled for June 16 in order to give Matrix an opportunity to appeal my decision denying the Chapter 11 Trustee's motion under Bankruptcy Rule 9019 to approve the Matrix settlement. My ruling denying Matrix' motion for a stay commenced at page 5 of the Transcript. At page 6 of the Transcript and later in the Transcript I refer to the entity referred to as "ZPG" (standing for ZPG Restaurant Associates, LLG), as the "alter ego" of Matrix. Matrix complains:

> Despite the fact that no determination was ever made that ZPG Associates . . . was an alter ego of Matrix the Court clearly referred to the entity as such. This pre-determination is representative of the decisions made by this Court that give rise to the appearance of partiality or bias and constitute sufficient reasons for this Court to recuse itself.

It has been my clear understanding since March 2005 that ZPG and Matrix were and are both entities under the ownership and control of the two shareholders of Matrix, Messrs. Nelson and Nieto. On March 24, 2005 a hearing was held to consider, among other things, a breakup fee or breakup fees sought by the original, and then a subsequent, stalking horse bidder for debtor's assets. ZPG Restaurant Associates, LLC was the original stalking horse bidder at $16 million. Subsequently, another bidder sought to replace ZPG as the stalking horse bidder with a $21 million bid. Both sought a breakup fee and they eventually reached a "breakup agreement" with the debtor to split the fee, with ZPG retaining the right to $50,000 of the fee. During the hearing an attorney named Graubard appeared and made the following statement (Tr. 26):

> MR. GRABAR [sic]: My client is Matrix Realty who signed the breakup agreement with the debtor because the same people are involved. The funds for the deposit came from Matrix, but ZPG Restaurant Associates, LLC is the entity that is in the restaurant in the food business, Your Honor.

Mr. Graubard's representation that "the same people are involved" in both Matrix and ZPG, that the "funds for the deposit" required of ZPG in respect of its stalking horse bid "came from Matrix" and that Matrix had "signed the breakup agreement" under which ZPG would split the breakup fee between itself and the successor stalking horse bidder would certainly suggest that Matrix and ZPG were controlled by "the same people." Indeed, the Purchase and Sale Agreement between the debtors and Matrix states in its

- 14 -

preamble that it was an agreement "by and between ZPG RESTAURANT ASSOCIATES, LLG" and the several debtors; the name of the ZPG contracting party was stricken out and in place of the ZPG name is handwritten "Matrix Realty Group, Inc. and/or its affiliates." To this date, even in the Matrix motion for recusal, it has never been suggested by anyone that Matrix and ZPG were not under the common ownership and control of Messrs. Nelson and Nieto.

Yesterday I received the parties' Joint Pretrial Order. Paragraph 2 of "DEFENDANT'S CONTENTIONS OF FACT" states as follows:

> 2. On April 15, 2005, a contract captioned (the "Contract") between the debtors and Matrix, and/or its affiliates executed between the debtors and ZPG Associates in exchange for $26,770,000. [sic]

Paragraphs 6 and 7 of DEFENDANT'S CONTENTIONS OF FACT state as follows:

> 6. Based upon the fraudulent bid of Borek, a new bid was submitted by ZPG to purchase the Assets of the Debtors.

> 7. The Contract was signed by Glenn Nelson as the Managing Member of ZPG.

Thus, even Matrix' contentions of fact in the Joint Pretrial Order treat ZPG and Matrix as alter egos, since the "new bid" for $26,770,000 was "submitted by ZPG to purchase the Assets of the Debtors" and the Contract was signed by Glenn Nelson "as the Managing Member of ZPG," although the final contract was between the debtors and "Matrix Realty Group, Inc. and/or its affiliates."

For Matrix' counsel to accuse the Court of bias or partiality is baseless and reprehensible.

**ORDER**

Upon the foregoing, it is hereby

ORDERED that Matrix' motion for an order recusing this Court is denied.

Dated: White Plains, NY
       June 14, 2006

                                           /s/ Adlai S. Hardin, Jr.
                                                     U.S.B.J.