UNITED STATES BANKRUPTCY COURT                           **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FOOD MANAGEMENT GROUP, LLC, | : | Case No. 04 B 22880 (ASH) |
| KMA I, INC., | : | Case No. 04 B 22890 (ASH) |
| KMA II, INC., | : | Case No. 04 B 22891 (ASH) |
| KMA III, INC., | : | Case No. 04 B 22892 (ASH) |
| BRONX DONUT BAKERY, INC., | : | Case No. 04 B 20312 (ASH) |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| FOOD MANAGEMENT GROUP, LLC, | : | |
| KMA I, INC., KMA II, INC., | : | |
| KMA I | : | |
| and BRONX DONUT BAKERY, INC., | : | |
| | : | |
| Plaintiffs, | : | Adv. Proc. No. 05-8636A |
| | : | |
| -against- | : | |
| | : | |
| MATRIX REALTY GROUP, INC., | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

A P P E A R A N C E S :

**DRINKER BIDDLE & REATH LLP**
**Attorneys for Plaintiff, Janice B. Grubin as Chapter 11 Trustee**
**By:  Edwin E. Brooks, Esq.**
**David S. Almeida, Esq.**
**191 North Wacker Drive**
**Suite 3700**
**Chicago, IL 60606**

**LAW OFFICES OF AVRUM J. ROSEN**
**Attorneys for Defendant, Matrix Realty Group, Inc.**
**By:  Avrum J. Rosen, Esq.**
**Fred S. Kantrow, Esq.**
**38 New Street**
**Huntington, NY 11743**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## Table of Contents

Page

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    (a)    Background — the Gianopoulos factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    (b)    Preparations for an auction of the franchised properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    (c)    Stalking horse bidders; adjournment of the auction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    (d)    The Matrix Contract; cancellation of the auction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    (e)    The Matrix/ZPG relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    (f)    Sale "as is, where is"; disclaimers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    (g)    Dunkin' Donuts' conditional approval of Matrix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    (h)    Matrix' repudiation of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    (i)    Sale of the assets to The Beekman Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.    Elements of plaintiffs' claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.    The existence of a valid and enforceable contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Anticipatory breach of Contract by Matrix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.    The debtors' willingness and ability to perform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        D.    Damages resulting from the breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    II.    Matrix' affirmative defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.    The divisibility of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        B.    The debtors' alleged inability to deliver certain assets . . . . . . . . . . . . . . . . . . . . . . . . . 32

        C.    The CPL and the CO for the Bronx Donut Bakery . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        D.    Assumption of the 2002 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        E.    The shop remodeling obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        F.    The argument that Matrix did not repudiate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        G.    The argument that a closing was not set and Matrix still had time to cure . . . . . . . . . . . . . . 41

        H.    Dunkin' Donuts' rejection of Krischer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        I.    The argument that the Dunkin' Donuts' Rider was not yet signed . . . . . . . . . . . . . . . . . . . 44

        J.    Fraud in the inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        K.    The fraudulent 64 East bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        L.    Impossibility/frustration of purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        M.    The December 15 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

        N.    Failure to join ZPG as a necessary party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## DECISION AFTER TRIAL

Plaintiffs-debtors entered into a contract (the "Matrix Contract" or, in context, the "Contract") dated April 15, 2005 with Matrix Realty Group, Inc. ("Matrix") for the sale of the debtors' assets to Matrix for a purchase price of $26.77 million subject to adjustments.  In accordance with the Contract, Matrix delivered to debtors' counsel a cash deposit of $2,400,000 (the "Matrix Deposit").  In June 2005 Matrix repudiated the Contract and demanded return of the Matrix Deposit.   The debtors commenced this adversary proceeding seeking damages for Matrix' anticipatory breach of the Contract and a declaratory judgment that the Matrix Deposit was forfeited to the debtors' estates.

By orders dated September 1 and 2, 2005, the Court authorized and confirmed the appointment of Janice B. Grubin as Chapter 11 Trustee (the "Trustee").  Since her appointment the Trustee has operated and controlled the debtors' assets and affairs and has prosecuted the adversary proceeding on behalf of the debtors' estates.

The adversary proceeding was tried to the Court without a jury, followed by two sets of post-trial submissions in accordance with schedules set by the parties.  This Decision sets forth the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## Jurisdiction

The Court has core jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the standing order of referral to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward.   The Bidding Procedures (referred to below) states:

> Any and all disputes related to the Auction or the sale of any of the Assets or the assignment of any of the Leases shall be adjudicated solely by the United States Bank-ruptcy Court for the Southern District of New York, White Plains Division.  The sub-mission of a Bid shall constitute an express consent to the exclusive jurisdiction of the Court for all matters related to the Auction and/or the sale of any Asset or Lease.

**The Facts**

**(a)**        **Background — the Gianopoulos factor**

The assets which were the subject of the Matrix Contract consisted of 24 existing

Dunkin' Donuts stores or shops and associated equipment and lease and franchise agreements in the

Westchester area, a bakery approved and authorized by Dunkin' Donuts to supply the stores (the bakery

premises included one of the 24 shops), and three "Shops Not Yet Opened."   These assets were held until

2002 by twenty companies (the "Gus Companies") owned and controlled by Constantine Gianopoulos

("Gus").

For a variety of reasons Dunkin' Donuts desired to terminate the Gianopoulos' interest in

the Dunkin' Donuts franchise stores in question.  An agreement dated October 18, 2002 (the "2002

Settlement Agreement") was entered into between Dunkin' Donuts Incorporated, Baskin-Robbins USA

Co., Baskin-Robbins Incorporated and Third Dunkin' Donuts Realty, Inc. (collectively "Dunkin'

Donuts"), the Gus Companies, Gus, and his brother Anastasios Gianopoulos ("Tom").   The 2002

Settlement Agreement resolved three separate lawsuits pending in Federal District Court between the

parties to the Agreement.   The 2002 Settlement Agreement provided, in relevant summary, that the

franchise agreements of the Gus Companies were terminated and that new franchise agreements would be

entered into between Dunkin' Donuts and "new entities" to be owned by Tom and/or Gus which were to

operate the Dunkin' Donuts franchise stores and bakery from the locations previously franchised to the

Gus Companies.   Thereafter, the corporate debtors were formed and constituted the "new entities"

referred to in the 2002 Settlement Agreement, and these entities operated the 24 Dunkin' Donuts stores

and bakery.   The new entities were owned and controlled by Tom and have been colloquially referred to

in these proceedings as the "Tom Companies" or the "debtors."

The 2002 Settlement Agreement required that the "new entities," *i.e.*, the Tom

Companies, sell all of the franchise stores and the bakery to purchasers having no affiliation with the

Gianopoulos family pursuant to purchase and sale agreements to be submitted to Dunkin' Donuts on or

before March 31, 2005 (the "Mandatory Sale of Franchises").  Specifically, paragraph 4 of the 2002

Settlement Agreement provided as follows:

> **Mandatory Sale of Franchises**: On or before March 31, 2005 Franchisees shall submit
> purchase and sale agreements to [Dunkin' Donuts] for all of their franchises.  If
> Franchisees are unable to close on the sale of any of their franchises by July 31, 2005 for
> which a purchase and sale agreement was submitted on or before March 31, 2005, then
> [Dunkin' Donuts] shall extend the closing date as reasonably necessary to complete the
> transfer(s), provided that all the parties, including the prospective transferee(s), are
> proceeding diligently and in good faith to closing.

In the event that the "new entities" did not comply with the Mandatory Sale of Franchises

provision, Dunkin' Donuts had the right under paragraph 6 of the 2002 Settlement Agreement to purchase

the franchises for a purchase price to be determined by the Dunkin' Donuts "business evaluation formula"

in effect at the time.

Shortly before June 2004, in an action brought by Questech Financial LLC ("Questech")

as secured creditor against the Gus Companies in Federal District Court (Westchester), the District Court

ordered the appointment of a receiver for the Gus Companies and the Tom Companies for alleged

misconduct by Gus and Tom and their counsel.   As a consequence of the appointment of the Receiver, on

June 1 and 2, 2004 the Tom Companies filed voluntary petitions under Chapter 11 and thereby became

the debtors in this Court.

Questech promptly moved for the appointment of a trustee under 11 U.S.C. § 1104,

alleging multiple acts of fraud and wrongdoing by Tom and Gus.   The motion was granted to the extent

that the Court entered an order dated June 28, 2004 for the appointment of an examiner (the "Examiner").

As noted above, the appointment of the Trustee was ordered and approved in early

September 2005 in response to the latest in a series of motions for the appointment of a trustee filed by

Questech following revelations of a continuing series of misconduct by Tom as owner and principal of

the debtors, many of which were disclosed in Interim Reports filed by the Examiner.

**(b)**       **Preparations for an auction of the franchised properties**

Mindful of the Mandatory Sale of Franchises provision of the 2002 Settlement

Agreement, the debtors retained Keen Strategic Advisors ("Keen") to develop a marketing plan designed

to reach as broad a spectrum of potential purchasers as possible.  An Amended Stipulation and Order was

entered by this Court on December 3, 2004 approving and confirming the assignment to and assumption

by the debtors of all the assets and liabilities of the Gus Companies, inter-corporate "formalities" which

were never attended to by Gus and Tom.  Despite little cooperation from Tom or Gus, on the evidence

before me it appears that the debtors' professionals, principally debtors' counsel, Keen, and the Examiner

and her accounting and legal professionals, acted diligently, responsibly and in good faith to rationalize

the debtors' books and records and financial affairs, which were in a state of disarray resulting from

chronic inattention, and perhaps intentional obfuscation by Gus and Tom, and to prepare for sale(s) of the

debtors' assets in compliance with the 2002 Settlement Agreement.

Keen, with input from other professionals, prepared an offering memorandum (the

"Offering Memorandum") containing broad disclaimers made necessary by the deficiencies in the

debtors' books and records.  The debtors' professionals and Keen assembled as comprehensive a

collection as possible of the debtors' books and records, financials and other corporate documents and

franchise, lease and other agreements relating to the franchised property offered for sale (collectively

"Level II Due Diligence Materials"), all of which were made available to prospective purchasers to enable

them to conduct their own due diligence.

On January 11, 2005, the debtors filed a motion seeking the Court's approval for an

auction of their assets and the bidding procedures that would govern the auction.  On February 24, 2005

the Court entered a consent order (i) authorizing the debtors to sell substantially all of their assets, (ii)

scheduling the bidding deadline, the auction, and the sale confirmation hearing for March 21, March 28

and May 26, 2005, respectively, (iii) approving the auction bidding procedures (the "Bidding Proce-

dures") and (iv) granting a 2.5% break-up fee to potential stalking horse bidders, subject to certain

conditions (the "Bid Procedures Order").

(c)      **Stalking horse bidders; adjournment of the auction**

On or about March 18, 2005, the debtors executed a stalking horse purchase and sale agreement with Matrix pursuant to which Matrix would acquire the debtors' assets for $16 million, with a $400,000 break-up fee (the "March 18 Matrix Sale Agreement").

Before a hearing on the motion to approve Matrix as the stalking horse bidder, an entity named 64 East 126th Street LLC ("64 East") submitted to the debtors a $21 million bid for the debtors' assets.   The same day, March 23, 64 East and the debtors entered into a purchase and sale agreement and rider to sell substantially all of the debtors' assets to 64 East, subject to higher and better bids, with a $525,000 break-up fee (the "64 East Sale Agreement").

The conflict arising from the dual break-up fees to be provided in connection with the March 18 Matrix Sale Agreement and the 64 East Sale Agreement was resolved by a consent Order entered March 31, 2005, pursuant to which the Court authorized (i) ZPG, a Matrix alter ego, to be paid a $50,000 break-up fee if the Court approved the sale of the assets to a person or entity other than ZPG, and (ii) 64 East to be paid a $250,000 break-up fee if the Court approved the sale of the assets to a person other than 64 East.  Since, as amplified below, ZPG and Matrix were corporate affiliates and *de facto* alter egos under common ownership and control, ZPG's putative entitlement to a $50,000 break-up fee under the March 31, 2005 Order was rendered moot when the Court approved the Matrix Contract.  Moreover, ZPG withdrew its bid before the adjourned date for the auction, and the deposit under the March 18 Matrix Sale Agreement was returned to Matrix, which had funded the deposit.

With discussions ongoing suggesting the possibility of soliciting a higher bid or bids for the debtors' assets, on March 25, 2005 the debtors filed a Notice of Adjournment and Change of Venue of Auction and Extension of Deadline to Submit Qualified Bids, giving notice that the bidding deadline and auction were rescheduled for April 15 and April 21, 2005, respectively.

**(d)**     **The Matrix Contract; cancellation of the auction**

The Matrix Contract, although dated "as of" April 15, was actually executed by the parties on Monday, April 18, 2005.   The Contract provided for a purchase price of $26,770,000, payable as follows:   (i) $2,400,000 as the Bidding Deposit; (ii) $21,600,000 at closing by certified check, cashier's check or irrevocable wire transfer and (iii) $2,770,000 as a promissory note payable, with interest, over ten years.   The same date, April 15, Matrix delivered a check for $2,400,000 as the Bidding Deposit to counsel for the debtors.

In the Matrix Contract the debtors and Matrix agreed to cancellation of the auction scheduled for April 21, and thereafter they jointly sought and obtained an order to cancel the auction and proceed with the private sale.   The parties disagree as to whether the auction was cancelled at the instance of the debtors, or Matrix insisted upon cancellation of the auction as a condition of its agreement.   It is not clear that this conflict need be resolved in order to determine the issues before me.   Nevertheless, I find as a fact that the auction was cancelled at the instance of Matrix as a condition of its agreement to purchase the debtors' assets at the Contract price.   This conclusion is based upon my assessment of the credibility of the witnesses who testified on the point and the fact that no reason (other than Matrix' insistence) has been suggested why the debtors would wish to cancel the auction scheduled to take place on April 21, just six days later.   By contrast, it would obviously be in Matrix' interest to forestall further competition for the debtors' assets.   The Matrix offer at $26.7 million was provoked not by the $21 million bid by 64 East but by apprehension on the part of Matrix that a competing bulk bidder (The Beekman Group, or "TBG") was contemplating a bid of up to $24 million for the assets.

Any doubt on the issue is resolved by the debtors' "EMERGENCY APPLICATION FOR AN ORDER" authorizing the debtors to cancel the auction and proceed with a private sale of the debtors' assets to Matrix, dated April 18, 2005.   The Emergency Application states that "a third 'bulk bidder' that has been conducting due diligence . . . indicated that its final bid on the assets would not exceed $24,000,000.00, subject to a private sale, which is measurably less than the Matrix Offer."   The Emergency Application represented to all parties in interest and to the Court that "as a condition to the

Matrix Offer, Matrix *requires* a private sale and the cancellation of the existing auction sale scheduled for April 21st" (emphasis supplied).   Matrix never sought to correct or gainsay this representation.

The cancellation of the auction undoubtedly had major adverse consequences to the debtors' estates.   But for the cancellation, it is certain that there would have been an auction.   While the future, which was foreclosed by cancellation of the Auction, can never be known, it is virtually certain that there would have been some competitive bidding, perhaps ending lower than $26.7 million but on better terms for the debtors' estates than the ultimate sale for $18 million to The Beekman Group, referred to below.   And there would have been at least one other bidder whose ten percent deposit and contractual obligation would have backed up the winning bidder in case the winner defaulted or repudiated, as Matrix did.

In any event, by Order entered April 27, 2005 this Court approved the cancellation of the auction and deemed Matrix to "be the Successful Bidder."

**(e)      The Matrix/ZPG relationship**

The Matrix Contract recites in the first four lines under the heading on page 1 as follows:

This Purchase and Sale Agreement, made as of the 15th day of April, 2005, (hereinafter "AGREEMENT"[*sic*], by and between ZPG RESTAURANT ASSOCIATES, LLC, an corporation/individual with its/his principal place of business located at 732 Route 347, Suite 200, Smithtown, NY 11787 (hereinafter "PURCHASER"), . . . .

The words "ZPG RESTAURANT ASSOCIATES, LLC" have been stricken out and the following words interlineated in place of the deleted language: "MATRIX REALTY GROUP, INC and/or its affiliates."   As stipulated in the Joint Pretrial Order (Undisputed Facts ¶ 18): "The Contract was modified in the Preamble to be between the Debtors and Matrix Realty Group, Inc., and/or its affiliates."

On the signature page of the Matrix Contract (page 16), the following appears:

PURCHASER

ZPG RESTAURANT ASSOCIATES, LLC

By:   _____[illegible]_____
Name: Glen Nelson
Title:   Managing Member

Paragraph 9.4 of the Matrix Contract, concerning notices necessary or desirable to be given under the Contract, provided that notices should be addressed to "PURCHASER at:

> ZPG RESTAURANT ASSOCIATES, LLC
> 732 ROUTE 347, SUITE 200
> SMITHTOWN, NY 11787
> (631) 979-2777
> Attn: Glen Nelson, Managing Member
> and Richard Nieto, Esq.

As noted just above, the executed Purchase and Sale Agreement dated March 18, 2005 was between the debtors and Matrix.  The March 18 Agreement was signed under the name "Matrix Realty Group, Inc." by Glen Nelson as President, and Section 9.4, the Notice provision, required Notice addressed to Matrix at its Smithtown address "Attn:   Glen Nelson, President and Richard Nieto, Esq.," just as in the Matrix Contract.   However, on the same date, March 18, debtors' counsel filed an "Emergency Application" for an order granting counsel authority to sign a stalking horse purchase and sale agreement on behalf of the debtors in the form annexed to the Application as Exhibit A.  The Purchase and Sale Agreement annexed as Exhibit A was between the debtors and ZPG Restaurant Associates, LLC, with the address the same as the Matrix address.   The signature block under the name ZPG Restaurant Associates, LLC called for signature by Glen Nelson, Managing Member, and the Notice provision in Section 9.4 called for a Notice addressed to ZPG Restaurant Associates, LLC at the Matrix address "Attn: Glen Nelson, Managing Member and Richard Nieto, Esq."

In addition, it should be noted that the March 31, 2005 Consent Order resolving the conflicting entitlements to break-up fees of Matrix and 64 East provided for a break-up fee payable to ZPG, not Matrix, although the Purchaser party to the March 18 Matrix Sales Agreement was Matrix, not ZPG.

The debtors asserted, and Matrix admitted that Matrix was the contracting party and was in identity of interest with ZPG in the following allegations in the complaint in this adversary proceeding:

> 39.      . . .   ZPG is a party with an identity of interest with Matrix, the current contract vendee.   . . .

43.     Thereafter, just four (4) business days before the Auction, Matrix, a party in identity of interests with ZPG, made an offer of $26,770,000.00 composed of a $24,000,000.00 cash component at closing and the balance to be paid over ten (10) years.

45.     Thus, on or about April 15, 2005, Plaintiffs and Defendant [*i.e.*, Matrix] entered into a contract of sale (the "Matrix Contract"), a copy of which is annexed hereto as Exhibit "6".

In his affidavit submitted on the cross-motions for summary judgment, Glen Nelson swore that he was a shareholder of Matrix and managing member of ZPG, and that ZPG had an "identity of interest with Matrix."

Finally, assuming without concluding that ZPG was in fact an entity organized and existing in 2005 (there is no evidence in the trial record establishing such fact), it is clear from the testimony of the witnesses on behalf of Matrix that ZPG had no assets or property of any kind and no business, and that Matrix funded the deposits under both the March 18 Matrix Purchase and Sale Agreement and the Matrix Contract and received the refund of the deposit for the March 18 Agreement.

In short, the admissions of Matrix in its answer and in the Undisputed Facts section of the Joint Pretrial Order and the evidence summarized above all demonstrate conclusively that Matrix was the contracting party under the April 15 Matrix Contract and is the proper party defendant in this adversary proceeding, and that ZPG, if it existed at all, was the creation and tool of and was controlled by Matrix and its principals, Glen Nelson and Richard Nieto.

**(f)     Sale "as is, where is";  disclaimers**

The Offering Memorandum and the Bidding Procedures made clear that the debtors' assets were to be sold "as is, where is" and that there were no representations or warranties other than as expressly set forth in the Purchase and Sale Agreement.

Consistent with the Offering Memorandum and the Bidding Procedures, the Matrix Contract included both the "as is, where is" limitation and an integration clause.  Sections 1.5 and 9.8 of the Contract stated:

1.5  <u>Condition of Assets</u>.  All of the tangible and intangible assets to be transferred hereunder are hereinafter collectively referred to as the "ASSETS" and shall be delivered at closing "as is where is", in substantial working order, without

representation or warranties of any kind except as expressly provided herein or in the offering memorandum, and any amendments thereto ("OFFERING MEMORANDUM") heretofore provided to PURCHASER.

9.8. <u>Entire Agreement</u>.  This AGREEMENT sets forth the entire agreement and understanding of the parties hereto and supersedes any and all written or oral agreements or representations between parties hereto relating to the transactions contemplated by this AGREEMENT or related documents, except that this AGREEMENT incorporates those certain Court Orders approving the BIDDING PROCEDURES and approving the Bankruptcy Code Section 363 sale pursuant to this AGREEMENT.

As a consequence of these quoted provisions of the Matrix Contract and the two Court Orders referred to therein, the Bidding Procedures by their own terms were made part of the Contract and were binding on Matrix.

The Bidding Procedures contained disclaimers of unusual breadth and scope.   Because of Matrix' defenses of misrepresentation and non-performance by the debtors, it is important to read and understand the full import of the disclaimers in considering the Trustee's response to the Matrix defenses. Quoting from the Bidding Procedures:

<u>Page 2</u>

Each bidder (a "Bidder" and collectively, the "Bidders"), as a consequence of submitting a Bid for any or all of the Assets, shall be deemed to acknowledge (a) that any sale, assignment or other disposition of each of the Assets shall be without representa-tions or warranties of any kind, nature or description by the Debtors, their agents, repre-sentatives, consultants and/or attorneys, (b) that it is bound by these Bidding Procedures, (c) that it had an opportunity to, or waived any right to, inspect and examine the applicable Lease and all other pertinent documents with respect thereto prior to making its Bid and that each such Bidder relied solely on that review and upon its own investi-gation and inspection of the Assets in making its Bid and (d) that the Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtors, their agents, representatives, consultants and/or attorneys.

<u>Pages 17-19</u>

D.    <u>Disclaimer</u>

1.   <u>As Is, Where Is</u>.  Any sale, assignment of (*sic*) other disposition of each of the Assets shall be without representations or warranties of any kind, nature or description by the Debtors, their agents, representatives, consultants and/or attorneys. Each of the Assets shall be transferred on an "as is" and "where is" basis.

2.   <u>Information for Informational Purposes Only</u>.  Any and all information and/or documentation provided to prospective Bidders":

(a)  has been prepared for informational purposes only;

(b)  has been prepared from materials supplied by the Company; and

(c)  is being furnished through Consultant solely for use by prospective buyers in considering their interest in acquiring the Assets.

By accepting documents and data from the Company and/or Consultant ("Data"), the recipient acknowledges and agrees that:  The information provided by Company and/or Consultant has been prepared to assist interested parties in making their own evaluation of the Assets and does not purport to be all-inclusive or to contain all of the information that a prospective buyer may desire.   In all cases, interested parties should conduct their own investigation and analysis of the Company's assets, conduct site inspections and scrutinize the Data.  The Consultant has assumed no responsibility for independent verification of any of the information contained herein and has not in fact in any way audited such information.  The Company, its officers, directors, employees, and its professional advisors, including but not limited to Consultant, legal counsel, and/or other advisors and their respective affiliates and representatives (collectively, the "Professionals") are not making nor will they make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise, with respect to the Assets and with respect to the accuracy, reliability or completeness of the Data, except as expressly stated in a contract executed by Company.  The Company and its Professionals expressly disclaim any and all liability based on or relating or pertaining to any written or oral statements, financial information, projections, representations, warranties, promises or guarantees, with express, implied or by operation of law or otherwise.

The Offering Memorandum, the specific terms of which "are incorporated into the

[Matrix] Contract" (Joint Pretrial Order, Undisputed Facts ¶ 15), also contained sweeping disclaimers

which are important to Matrix' defenses.  Quoting:

<u>Page i</u>

. . . No representation or warranty, express or implied, is made by FMG, its counsel, Rattet Pasternak & Gordon Oliver, LLP ("RP&GO"), KEEN, Dunkin' Donuts Incorporated, Baskin-Robbins USA, Co. and Third Dunkin' Donuts Realty (collectively "Dunkin' Donuts Co.") or by any of their respective affiliates, agents, employees or representatives as to the accuracy or completeness of such information or/of any other written or oral communication transmitted or made available to a prospective buyer of FMG.

In all cases, interested parties should conduct their own investigation and analysis of FMG and of the information contained in this Memorandum.   Nothing contained in this Memorandum is, or shall be relied upon as, a promise or representation by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives as to the past or the future performance of FMG.  The contents of this Memorandum have not been independently verified by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives.

In fact, all financial information contained herein is unaudited and is derived from FMG's books and records, which have not been reconciled since August, 2003.

FMG, RP&GO, KEEN and each of their respective affiliates, agents, employees or representatives expressly disclaim any and all liability relating to the use of the Memorandum, or such other information as may be provided (whether communicated in oral or written form), to a prospective buyer or any of its affiliates, agents, or representatives. Any estimates, projections and forward-looking statements contained herein (a) have been prepared by, and are based on information currently available to FMG and (b) involve significant known and unknown risks, uncertainties and other factors, including subjective assumptions, judgments and analyses. No representation or warranty can be made by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives as to their attainability. Accordingly, actual results may differ substantially and materially from the estimates, projections and forward-looking statements contained in this Memorandum. FMG or any person acting on its behalf, including RP&GO, KEEN, & Dunkin' Donuts Co. undertakes no obligation to update these estimates, projections and forward-looking statements. All financial information contained in this Memorandum should be read in conjunction with the accompanying discussion points. Only those representations and warranties to the extent made in a definitive, written agreement, subject to such limitations and restrictions as may be specified therein, shall have any binding or legal effect.

Page 7

Exhibit E — Franchise and Lease Expiration Dates: Each location is subject to both a real estate lease and a franchise agreement. As part of the bankruptcy proceeding, certain non-residential real property leases and furniture, fixtures and equipment were transferred to the bankruptcy estate of the debtors pursuant to a stipulation so ordered on December 3, 2004. The underlying leases may or may not include options, subleases, percentage rent and/or escalating rent.[10] Certain franchise agreements include an Enterprise Business Offer ("EBO") agreement executed with Dunkin' Donuts® that allows the franchisees to vest extra time on their franchise agreements at a discounted price if the franchisees agree to remodel the locations at a future date. The EBO's have been paid for; however, certain necessary improvements have not yet been completed. It is estimated that the additional costs to remodel would fall between $75,000 and $125,000 per location.[11] Thus, the buyer(s) of these locations would have the option to complete the remodels, as per the respective EBO's, and thereby automatically extend the term of the respective franchises through various periods up until 2022. **Note:** No representation is being made that the franchise agreements can or will be renewed with Dunkin' Donuts Co. to correspond with the expiration of existing leases.

_____

[10]   FMG management is currently seeking the extension of short term leases. Updated information will be made available to interested parties.

[11]   Estimate is per company management.

Page 9

Exhibit N — Historical Fixed Assets:  . . .  Additionally, some stores may require additional capital expenditures for remodeling should their franchise agreements be extended per the EBO's discussed above.  . . .

**(g)**     **Dunkin' Donuts' conditional approval of Matrix**

The debtors' franchise agreements with Dunkin' Donuts (which were expressly incorporated into the Matrix Contract) required the debtors to obtain the consent of Dunkin' Donuts in order to transfer their franchises.   By the same token the Matrix Contract conditioned the sale on the approval of the prospective purchaser by Dunkin' Donuts.   Sections 4.2 and 6.2 of the Matrix Contract provided:

4.2  <u>Dunkin' Donuts Approval</u>.  DUNKIN' DONUTS shall have either actually or by judicial decree of the Court consented to this AGREEMENT (including, but not limited to, approval of PURCHASER) as provided in the FRANCHISE DOCUMENTS, OFFERING MEMORANDUM, the AUCTION APPROVAL ORDER and the Court approved BIDDING PROCEDURES established with respect to the Bankruptcy Code and shall have not otherwise have exercised [sic] its right of first refusal (subject to acknowledgement and approval by the Bankruptcy Court).

6.2  <u>Dunkin' Donuts Approval</u>.  DUNKIN' DONUTS shall have either actually or by judicial decree of the Court, consented to this AGREEMENT (including, but not limited to, approval of PURCHASER) as provided in the FRANCHISE DOCUMENTS and the BIDDING PROCEDURES.

By letter dated May 25, 2005 (the "May 25 letter") Dunkin' Donuts initially rejected Matrix as a prospective franchisee on the grounds (i) that Dan Krischer, whom Matrix had hired as operations manager of the franchises, was not morally or ethically fit to operate a Dunkin' Donuts franchise,[1] and (ii) that the purchase price under the Matrix Contract was too high.[2]

However, by letter dated June 8, 2005 (the "June 8 letter") Dunkin' Donuts reversed its position and agreed to approve Matrix as prospective franchisee conditioned only on Matrix hiring an

---

[1]     Krischer had testified in a prior bankruptcy case in the Southern District of New York (Manhattan) that, while acting as operations manager of several franchisees (not Dunkin' Donuts), he had knowingly understated the revenues of the franchisee.  The false financial statements were used to defraud both the franchisor and the taxing authority, inasmuch as the franchise fees and the taxes were both calculated on the basis of the false (understated) franchise revenues.   In addition, Krischer had accepted payments in cash off books from his former franchisee-employer, had submitted a false or misleading personal financial statement to Dunkin' Donuts in connection with his part of the Matrix application and had given evasive and deceitful answers when interviewed by Dunkin' Donuts.

[2]     The Dunkin' Donuts concern with respect to the purchase price was that Matrix had agreed to pay too much for the debtors' franchises and that Matrix would be unable to operate the franchises at a profit and still service their debt, make the necessary franchise payments to Dunkin' Donuts and comply with their obligations under the franchise leases, including their obligations to remodel the stores.  These concerns were communicated to the Matrix principals, Richard Nieto and Glenn Nelson.

appropriate operations manager in place of Krischer, thereby withdrawing its financial objection based on

the purchase price.  After noting Dunkin' Donuts' prior objection to the financial aspects of the Matrix

purchase, the June 8 letter stated:

> Be that as it may, and notwithstanding our objections, to persist would place us in the
> peculiar position of expending our own resources to protect sophisticated and highly-
> capitalized businesspersons (Messrs. Nelson and Nieto) from entering into a transaction
> which they are apparently determined to pursue.   We choose not to spend our money this
> way.   Therefore, [Dunkin' Donuts] no longer object[s] to the proposed purchase based
> on the price or the structure of the payment.  The principals of the would-be Buyer have
> been generally apprised of our position, and will receive a copy of this letter.
> Apparently, they have conducted their own financial analysis and concluded that they
> will be able to operate at a profit, service debt, make all payments, and comply with all
> obligations under the Franchise Agreements and leases, including, without limitation,
> their remodel obligations.   The choice to go forward is theirs.

One of Matrix' controversies with Dunkin' Donuts which arose during Matrix' post-April 15 meetings

with Dunkin' Donuts representatives concerned the franchisee's obligations to remodel the shops under

existing Dunkin' Donuts franchise agreements and written policies.  In the June 8 letter, Dunkin' Donuts

agreed to permit Matrix to complete the remodeling obligations on a modified and extended schedule,

stating:

> Another source of our objection was and is the Buyer's apparent failure to plan for the
> cost of completing long-overdue remodels of approximately eleven locations.   The
> Buyer expressed concern about the need to close the stores simultaneously, and stated its
> intention to remodel on its own timetable, and to sell food while the work is being done
> in each store.  We will permit the overdue remodels to be completed on a staggered basis
> within eighteen (18) months from the date of closing.   The Buyer can choose the order in
> which the stores will be remodeled, but it must start by remodeling two (2) stores within
> two months of the closing and must remodel two (2) stores every two months thereafter,
> until the remodeling is complete.   Each store must close and remain closed during the
> remodel.  Naturally, all other remodels must be completed as and when they become due,
> according to the respective Franchise Agreements.

Dunkin' Donuts did not relinquish its objection to Matrix' employment of Krischer to manage the

franchises.  The June 8 letter stated:

> Our position with regard to Mr. Krischer remains unchanged.  He may not become a
> franchisee or assume a management role in a franchise.   Mr. Krischer admitted under
> oath that he intentionally underreported sales to another franchisor and to the taxing
> authorities, both of which are crimes and violations of our Franchise Agreements.
> Together and separately, they have been the basis for termination on past occasions.
> Without more, Mr. Krischer is disqualified, but we would add that he supplied materially
> inconsistent information concerning his net worth and liquidity, and was generally

- 16 -

evasive in the application and interview process.  Under the circumstances, he may not become a franchisee.

The June 8 letter then stated unequivocally that Dunkin' Donuts would approve Matrix if Matrix' principals, Nelson and Nieto, would bring in a new, qualified manager for the shops to replace Krischer. The letter stated:

> If Messrs. Nelson and Nieto wish to move forward with the deal without Mr. Krischer, we would be willing to accept them if they brought in a new principal with the skills and experience sufficient to operate such a large network of Dunkin' Donuts and Baskin-Robbins franchises.

Despite this express approval by Dunkin' Donuts, Matrix made no effort to replace Krischer with another employee to manage the Dunkin' Donuts shops.

Prior to Dunkin' Donuts' conditional approval of Matrix in the June 8 letter, the debtors filed an application for a preliminary injunction which sought, among other relief, a declaration that Dunkin' Donuts had unreasonably withheld its consent to the sale to Matrix.[3]   A hearing on the debtors' motion was held on June 29, 2005 solely on the issue whether Dunkin' Donuts' refusal to approve Krischer as manager of the franchises on behalf of Matrix was reasonable.  At the conclusion of the June 29 hearing, this Court concluded that Dunkin' Donuts' rejection of Krischer as manager of the franchises was entirely appropriate in view of Krischer's self-confessed fraudulent conduct as manager of another franchise business.

**(h)**     **Matrix' repudiation of the Contract**

By letter dated June 10, 2005 (the "June 10 letter"), just two days after Dunkin' Donuts' June 8 letter approving Matrix as a franchisee conditioned only on Matrix' replacing Krischer, Matrix unequivocally informed the debtors' counsel that Matrix would not close on the purchase contemplated by the Contract.  The June 10 letter stated in full:

[Matrix Realty Group, Inc. Letterhead]

\*   \*   \*

---

[3]     The debtors' motion was filed June 1, 2005, after Dunkin' Donuts' May 25 letter but before its June 8 letter.

Dear Messer [*sic*] Rattet and Shure:

We have received the correspondence of Dunkin Brands, dated May 27, 2005 and June 8, 2005. Based on said correspondence we respectfully request a cancellation of the underlying Purchase and Sale Agreement dated April 11, 2005 and request an immediate return of our full contract deposit of $2,400,000 being held in escrow by the debtor's [*sic*] legal counsel.

This decision is based on two separate justifications. Firstly, the express written disapproval of our buyers group by Dunkin Brands. More specifically, its rejection on several grounds of our managing partner, Daniel Krischer. This is fatal to our continuing interest since Mr. Krischer is the sole person with retail experience in our investment group. From the beginning he has been key to our interest in the acquisition of the Dunkin Donuts Franchises.

Secondly, the financial reality of the proposed transaction differs significantly and materially from when it was presented and proposed to Matrix by the Seller via the Offering Memorandum and pursuant to several personal meetings with the debtors and Mr. Rattet. Numerous and varied false and misleading statements and misrepresentations of fact, both written and oral, as well as fraud in the inducement, is clearly evident. All parties are familiar with many of these issues and they have been the subject of many contentious and discouraging conversations among the parties, Mr. Rattet and Mr. Shure.

Considering the above, I regret to inform Mr. Rattet that it would be pointless at this time to have a meeting with the debtors and/or their legal counsel in order to resolve differences over the purchase price for the purpose of offering a unified position against Dunkin Brands. We are conscious of the fact that the back-up bidder has also become aware of many misrepresented facts and false financial information, which have come to light in the past two months, and has adjusted its interest accordingly. We understand that they are also no longer willing to proceed under the price and terms of its original stalking horse back-up bid.

In light of the above, we respectfully request return of our original contract deposit of $2,400,000 with all accrued interest. Please forward your escrow check for this amount to Matrix Realty Group, Inc. within 2 business days. We will waive any claim for expenses and/or damages if said check is received within said 2-day period. If our request is wrongfully declined or ignored we will initiate legal proceedings for its return and pursue all of our rights accordingly to the laws of the State of New York. This will include damages related to Sellers [*sic*] misrepresentations, for our expenses while working on this transaction, as well as consequential damages for the loss of use of our investment funds. The protection of our cash deposit will also compel us to file liens against all assets of the debtor's [*sic*].

Your prompt attention to this matter is appreciated. Please guide yourself accordingly.

Sincerely,

/s/
Richard Nieto, Esq.

Matrix' repudiation of the Contract was confirmed at the June 29 hearing at which the debtors (but not Matrix) challenged Dunkin' Donuts' rejection of Krischer as manager of the shops. Matrix appeared at the hearing by counsel and one of its principals in an effort to dissuade the Court from holding the hearing, asserting that the issue (Krischer's fitness to serve as manager of a franchise

business) was immaterial and moot because of Matrix' decision not to close under the Contract regardless of the outcome of the hearing. Thus, Matrix' attorney stated:

> MR. KERA: Matrix is not interested any further in pursuing this offer. They feel there have been a lot of misrepresentations on the stores that are available and financials. So it's kind of irrelevant whether Mr. Krischer is acceptable or not because they just did not want to pursue this deal any further.

One of Matrix' principals, Richard Nieto, appeared during the June 29 hearing, prior to the examination of any witnesses, and informed the Court that:

> There's so many, I don't want to get into it right now but it's clear that no one is expecting us to go through with this transaction based on the purchase of sale agreement that was executed two months ago and we feel its [sic] moot to have this big effort as to whether [Krischer] is properly rejected or not when I think everybody knows we're not going through with the deal. . . .

**(i)      Sale of the assets to The Beekman Group**

In November 2005 the Trustee moved for approval of an agreement to sell the debtors' assets to an affiliate of The Beekman Group ("TBG"). The TBG Sale Agreement contained numerous provisions adverse to the debtors which were not in the Matrix Contract and the prior stalking horse sale agreements required under the Bidding Procedures. On December 15 the Court entered a series of orders approving the TBG Sale Agreement for a purchase price of $18 million subject to certain downward adjustments.

**Discussion**

**I.      Elements of plaintiffs' claim**

Under New York law, in order to prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) breach of the contract by the defendant, (3) performance by plaintiff unless excused or precluded and (4) damages resulting from that breach.[4]    *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004). Each of these elements must be proven by a preponderance of the credible evidence. *Republic Corp. v. Procedyne Corp.*, 401 F. Supp. 1061, 1068 (S.D.N.Y. 1975). For

---

[4]      In a conference call prior to trial, it was established between counsel and the Court that the trial would be limited to the determination of liability, and the issue of damages was reserved for later determination.

New York cases, *see Furia v. Furia*, 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 ( N.Y. App.Div. 1986) ("[t]he

complaint states a valid cause of action against defendant based upon breach of a contract. The pleading

clearly specifies the terms of the agreement, the consideration, the performance by plaintiffs and the basis

of the alleged breach of the agreement by defendant."); *Ledain v. Town of Ontario*, 192 Misc.2d 247, 746

N.Y.S.2d 760, 763 (N.Y. Sup. Ct. 2002), *aff'd*, 305 A.D.2d 1094, 759 N.Y.S.2d 426 (N.Y. App. Div.

2003) ("The common law elements of a cause of action for breach of contract are (1) formation of a

contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform,

and (4) resulting damage (citations omitted)); *WorldCom, Inc. v. Sandoval*, 182 Misc.2d 1021, 701

N.Y.S.2d 834, 836 (N.Y. Sup. Ct. 1999)  ("An action for breach of contract requires proof of (1) a

contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages"

(citing *Rexnord Holdings v. Bidermann*, 21 F.3d 522 (2d Cir. 1994)); *Lehmann v. Lehmann*, 182 Misc.2d

22, 696 N.Y.S.2d 663, 665 (N.Y.City Civ.Ct. 1999) ("To state a claim for breach of contract a party must

establish (1) the existence of an agreement; (2) due performance of the contract by the party alleging the

breach; (3) a breach; and (4) damages resulting from the breach." (citing *Reuben H. Donnelley, Corp. v.

Mark I. Mktg.Corp.*, 925 F. Supp. 203, 206 (S.D.N.Y. 1996)); *J&L Am. Enters., Ltd. v. DSA Direct, LLC*,

10 Misc.3d 1076(A), 814 N.Y.S.2d 890 (Table) (N.Y. Sup. Ct. 2006), 2006 WL 216680, *5 (unpublished

decision) ("The elements of a breach of contract claim are (1) the making of an agreement; (2)

performance of the agreement by one party; (3) breach by the other party; and (4) damages") (citations

omitted).

### A.    The existence of a valid and enforceable contract

The Matrix Contract is a written document, which was introduced in evidence at the trial

as an exhibit. There is no dispute that the Contract is genuine, that it was signed by authorized repre-

sentatives of the debtors and that it was signed on behalf of Matrix by Glen Nelson, who was one of the

two principals of Matrix and a principal and "Managing Member" of Matrix' affiliate, ZPG. There is no

dispute that the Contract bound the debtors to sell and Matrix or its designated affiliate ZPG to purchase

the assets covered by the Contract in accordance with the terms of the Contract. And there is no dispute

that representatives of both the debtors and Matrix worked diligently to do what had to be done to enable

the parties to close the purchase and sale called for under the Contract until shortly before June 10, 2005

when Matrix' principals, Glen Nelson and Richard Nieto, apparently influenced by Dunkin' Donuts'

concern that the purchase price was too high, decided that they were no longer interested in closing on the

transaction in accordance with the Contract.

Accordingly, the first element of plaintiffs' case — the existence of a valid and

enforceable contract — has been established.

**B.       Anticipatory breach of Contract by Matrix**

Nor can there be any doubt that Matrix repudiated the Contract in June 2005 by its

June 10 letter (quoted above), confirmed by its conduct thereafter and by the statements of its counsel and

one of its principals in open court at the June 29 hearing (quoted above).   The repudiation was

unequivocal and final.

The Matrix Contract was governed by New York law.  Under New York law a party to a

contract commits an anticipatory breach of the contract when, prior to the time set for performance under

the contract, it declares expressly or by its conduct that it will not perform its part of the bargain.  *In re*

*Asia Global Crossing, Ltd.*, 326 B.R. 240, 249 (Bankr. S.D.N.Y. 2005), *adhered to in part on reorg.*, 332

B.R. 52 (Bankr. S.D.N.Y. 2005) ("An anticipatory repudiation occurs when a party to a contract (1) states

that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders

the obligor unable or apparently unable to perform his obligations." (citations omitted); *see also De*

*Lorenzo v. Bac Agency, Inc.*, 256 A.D.2d 906, 681 N.Y.S.2d 846, 848 (N.Y.App.Div. 1998); John D.

Calamari & Joseph M. Perillo, The Law of Contracts § 12.4, at 525 (3rd ed.1987); Restatement

(Second) of Contracts § 250 (1981) ("A repudiation is (a) a statement by the obligor to the obligee

indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages

for total breach under § 243, or (b) a voluntary affirmative act which renders the obligor unable or

apparently unable to perform without such a breach."); *Lucente v. Int'l Bus. Mach. Corp*., 310 F.3d 243,

258 (2d Cir. 2002) ("Anticipatory repudiation occurs when, before the time for performance has arisen, a

party to a contract declares his intention not to fulfill a contractual duty") (citations omitted).

On the facts and the law, plaintiffs have sustained the second element of their burden of proof to establish a claim for breach of contract. There can be no doubt that Matrix repudiated the Contract in June 2005, before the parties had even discussed setting a date for a closing under the Contract. Matrix thereby committed an anticipatory breach of the Contract.

### C.    The debtors' willingness and ability to perform

There is no dispute that, at all times prior to Matrix' repudiation, the debtors were not merely willing but extremely anxious to close on the sale to Matrix, and that the debtors' and the Examiner's professionals and Keen were working diligently with Matrix to complete the steps necessary for the sale. At no time did the debtors or their representatives state or express by word or deed that they were unable or unwilling to perform their obligations under the Matrix Contract.

Matrix' principal affirmative defense is that the debtors did not have the ability to perform all of their obligations under the Matrix Contract because they could not deliver all of the assets called for under the Contract. Specifically, Matrix asserts that, if a closing had been scheduled,[5] the debtors could not have delivered two stores (392 East 149 Street and 38 Mill Road), the three "shops not yet opened," four lease extensions, "clear title" to twelve stores,[6] and the certificates to operate the bakery.

The factual defects in this affirmative defense are dealt with in point II.B, below. But there is a basic, overarching defect in Matrix' argument that the debtors did not have the ability to

---

[5]    In fact, a closing was never scheduled. The Matrix Contract provided in Section 1.1 that "The closing shall take place at such time and/or place as shall be mutually agreed upon by the parties hereto. . . ." The parties never agreed upon a closing date, and there is no trial evidence of any discussion of setting a closing date. Matrix has argued that the closing date had to be not later than July 31, 2005 by reason of the Mandatory Sale of Franchises provision of the 2002 Settlement Agreement. But that provision provided that Dunkin' Donuts would extend the July 31, 2005 deadline "as reasonably necessary to complete the transfers. . . ." In fact, Dunkin' Donuts did not object to a December 2005 initial closing date under The Beekman Group contract despite the fact that there was no contract at all for sale of the assets from Matrix' repudiation on June 10 until the TBG contract in November 2005. There is no reason to believe that Dunkin' Donuts would not have granted the debtors and Matrix at least the same extension until December 2005 if the debtors and Matrix had been "proceeding diligently and in good faith to closing."

[6]    Matrix' vague and unsupported contention that the debtors could not deliver "clear title" to twelve stores is incomprehensible. The debtors did not hold title to any of the twenty-four operating stores, the three shops not yet opened or the bakery. The assets consisted of twenty-four operating Dunkin' Donuts stores each with a lease and a franchise agreement, a leasehold interest in the bakery and purported lease and franchise agreements for the three shops not yet opened, *i.e.*, locations that did not have an operating Dunkin' Donuts shop. There was no obligation under the Matrix Contract to convey "clear title" to any real estate.

perform under the Contract, namely, the practical and legal consequences of Matrix' anticipatory breach of the Contract.

The consequences of anticipatory breach are well established. Anticipatory repudiation by one party precludes fulfillment of the contract by both sides and, therefore, excuses performance by the counter-party. By foreclosing the future, the breaching party deprives the counter-party of the opportunity to take the necessary actions to tender its performance under the contract. For this reason, the breaching party is estopped to claim that its own breach does not matter because the counter-party could not have performed anyway. *See In re Asia Global Crossing, Ltd.*., 326 B.R. at 249 ("If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options. He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid. . . . If he elects to terminate the contract and sue for breach, he is excused from tendering his own performance" (citations omitted)); *De Forest Radio Telephone & Telegraph Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293 (1926) ("[A non-breaching party] is not obliged to go further and perform in the face of a flat refusal and rejection by the other party."); *Pitcher v. Benderson-Wainberg Assocs. II, Ltd Partnership,* 277 A.D.2d 586, 587, 715 N.Y.S.2d 104 (N.Y. App.Div. 2000) (". . . the effect of an anticipatory breach by one party to a contract is the discharge of the other party from its legal obligations") (citations omitted); *Inter-Power of New York Inc. v. Niagara Mohawk Power Corp*., 259 A.D.2d 932, 934, 686 N.Y.S.2d 911 (N.Y. App.Div. 1999) (". . . while an anticipatory breach relieves the nonbreaching party of the need to tender performance, such party nonetheless is required to show that it was ready, willing and able to perform its obligations under the contract"); *Mignon v. Tuller Fabrics Corp*., 1 A.D.2d 174, 148 N.Y.S.2d 605, 607-08 (N.Y. App.Div. 1956) ("The rule excusing further performance when there has been an anticipatory breach and authorizing recovery against the party so indicating an intention to breach is a rule sustained by 'the great weight of authority'. . . . It is recognized in New York.") (citations omitted); WILLISTON ON CONTRACTS, § 39:37 (4th ed. 2000) ("Where one party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived and before a default justifying the repudiation has occurred, the other party is relieved from performance on his or her side") (footnote omitted); John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS § 12.8, at 485

(4th ed. 1998) ("The repudiation, however, relieves the party of any necessity to tender performance")

(footnote omitted).

In cases where it may not be possible to know whether the counter-party would have

been able to perform, anticipatory repudiation by the breaching party relieves the counter-party of the

need to prove its ability to perform. In *G.G.F. Properties, LLC v. Yu Mi Hong*, 284 A.D.2d 427, 726

N.Y.S.2d 454, 455-56 (A.D.2d 2001), plaintiff G.G.F. Properties, LLC's repudiation absolved defendant

Hong from her lack of authority to perform. The Appellate Division said:

> "In any event, GGF repudiated the contract when it demanded a reduction in price, and
> insisted on that price reduction after it was 'vehemently rejected'. *The repudiation of the
> contract relieved Hong of any obligation to prove her ability to perform the contract*."
> (citation omitted) (emphasis supplied)

The argument that the debtors could not have delivered the two lease extensions is based

on speculation. Matrix' repudiation of the Contract in early June 2005 foreclosed the future and rendered

it impossible to know whether the debtors could have delivered the other shops and leases in question.

Who is to say that the passage of time measured in weeks or months, persuasive negotiations, changes in

landlord circumstances and the blandishments of money would not have enabled the debtors to deliver

some or all of the assets.

In that connection, it should be noted that the $26,770,000 purchase price under the

Contract so far exceeded the debtors' total liabilities at the time that it was then believed the sale would

have resulted in a substantial return to equity. "Money talks," as the saying goes, and the Contract price

would have yielded substantial excess funds which might have been used to "buy out" some or all the

obstacles to delivering the units in question. Of course, that is speculation and one cannot know now

whether the debtors could have delivered all the lease extensions. But it is equally speculative for Matrix

to assert that the debtors could not have delivered all the lease extensions in question between, say, June

and December 2005, armed with several million dollars of the Matrix purchase price in excess of the

amounts necessary to pay all creditors in the case. The consequence of that uncertainty must fall on one

side or the other, and as between the breaching party and the counter-party whose ability to perform was

foreclosed by the other's breach, it is the breaching party that must bear the consequence.

Two facts are certain.   One is that Matrix' repudiation precluded the debtors' ability to use the Contract purchase price to fund whatever costs might have facilitated a closing on all the units. The other is that Matrix' repudiation foreclosed the future and made it impossible to know whether the debtors could have delivered all the lease extensions.   The law would pervert justice if it imposed upon the debtors the consequence of this uncertainty which was caused by Matrix' repudiation of the Contract.

But that is not the law.   It is firmly established that a party which breaches a contract and thereby precludes performance of the counter-party cannot invoke the county-party's lack of performance as a defense.   The Supreme Court restated this venerable and still universally-accepted principle of contract law in *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61 (1934):

> The applicable principle is fundamental and unquestioned.  "He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: 'This is your own act, and therefore you are not damnified'" (citations omitted).

For the sake of brevity, this fundamental principle may be conveniently referred to as the "Doctrine of Prevention of Performance."   The effect of the Doctrine is that a contracting party may not claim that the counter-party's non-performance excused its own obligation when performance was wrongfully precluded by the contracting party's own breach.   The Second Circuit Court of Appeals, the New York Court of Appeals and many other courts have restated the Doctrine in countless contexts.   *See also Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989) ("It is true that a condition precedent may be excused if the party whose performance is predicated on that condition somehow blocks its occurrence. 'It is a well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself'") (citations omitted); *A H.A. Gen. Constr., Inc. v. New York City Hous. Auth.*, 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (N.Y. 1998) ("A condition precedent is linked to the implied obligation of a party not to 'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'") (citation omitted); *Kirke La Shelle Co. v. The Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (N.Y. 1933) (noting the principle that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract"); *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782 (N.Y. 1971) ("The general rule is . . . that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition"); *Arc Elec. Constr. Co. v. George A. Fuller Co.*, 24 N.Y.2d 99, 104, 299 N.Y.S.2d 129, 247 N.E.2d 111 (N.Y. 1969) (a party cannot "'rely on [a] condition precedent . . . where the non-performance of the condition was caused or consented to by itself'") (internal citation omitted); *Stern v. Gepo Realty Corp.*, 289 N.Y. 274, 277, 45 N.E.2d 440 (N.Y. 1942) ("An allegation, therefore, that title did not close because of the vendor's neglect and refusal to discharge hens [sic, should read liens] against the property is sufficient to avoid the defense of non-performance of a condition precedent, . . . the performance of which he himself has rendered impossible") (citations omitted); *Amies v. Wesnofske*, 255 N.Y. 156, 162-63, 174 N.E. 436 (N.Y. 1931) ("If a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure . . . . It is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself") (citations omitted); *Patterson v. Meyerhofer*, 204 N.Y. 96, 100-01, 97 N.E. 472 (N.Y. 1912) ("In the case of every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.  This proposition necessarily follows from the general rule that a party who causes or sanctions the breach of an agreement is thereby precluded from recovering damages for its non-performance or from interposing it as a defense to an action upon the contract") (citations omitted); *Vandegrift v. The Cowles Eng'g Co.*, 161 N.Y. 435, 443, 55 N.E. 941 (N.Y. 1900) ("[I]f the impossibility [of performance] arises, directly or even indirectly from the acts of the promisee, it is a sufficient excuse for non-performance.  This is upon the principle that he who prevents a thing may not avail himself of the non-performance which he has occasioned") (citation omitted); *Lager Assocs. v. City of New York*, 304 A.D.2d 718, 719, 759 N.Y.S.2d 116 (N.Y.App.Div. 2003) (noting "a party to a contract cannot rely on the failure of another to perform a condition precedent where the party has frustrated or prevented the occurrence of the condition") (citation omitted); *Rochester Cmty. Individual Practice Assoc. v. Finger Lakes Health Ins. Co., Inc.*, 281 A.D.2d 977, 979, 722 N.Y.S.2d 663

(N.Y.App.Div. 2001) ("A condition precedent is linked to the implied obligation of a party not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (citations omitted); *Pitts v. Davey*, 40 Misc. 96, 81 N.Y.S. 264 (N.Y. Sup.Ct. 1903) ("A plaintiff cannot recover in an action against another for breach of contract . . . if it appears that he, directly or indirectly, prevented the other party from performing, and the default of the other party is primarily due to the act or neglect of plaintiff, then no recovery can be had, but the party prevented from performing in full may recover pro rata.   Otherwise[,] the plaintiff would recover the damages flowing from his own acts").

The Doctrine of Prevention of Performance is articulated in RESTATEMENT (FIRST) OF CONTRACTS § 295 (1932) as follows:

§ 295 Excuse Of Condition By Prevention Or Hindrance

If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless

(a)  the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party, or

(b)  the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

Matrix chose to repudiate the Contract on June 10, 2005.   It cannot now evade the consequences of that breach by asking the Court to speculate that the debtors could not have performed if Matrix had not breached.  As a matter of fact Matrix' breach precluded, and therefore as a matter of law excused, the debtors' performance under the Contract.

**D.**      **Damages resulting from the breach**

With Court approval the parties have agreed that evidence and argument on damages should await the Court's determination on the issue of liability.  Nevertheless, to establish liability the plaintiffs must make at least a *prima facie* showing that the defendant's breach of contract was the proximate cause of some economic harm or damage.

Plaintiffs have sustained their burden of making a *prima facie* showing of damage and causation.  The Matrix Contract called for payment on closing of $24 million in cash (the Deposit of $2,400,000 plus $21,600,000 by certified or cashier's check at closing) plus a $2,770,000 promissory note, payable, with interest, over ten years.  By contrast, the TBG Sale Agreement will result in payment to the debtors' estates a maximum of $18 million less substantial deductibles.  The differential constitutes *prima facie* evidence of damage resulting from the Matrix breach.

The foregoing is without prejudice to Matrix' right to present evidence and argument in a subsequent hearing that as a matter of fact or law the debtors suffered no causily-related economic harm, or that the damages should be limited to forfeiture of the Matrix Deposit, or that the *prima facie* contract damage differential should be reduced in any other manner.  Nor are the plaintiffs precluded from presenting argument and evidence that the damage to the debtors' estates from Matrix' breach exceeded the *prima facie* contract differential.

## II.    <u>Matrix' affirmative defenses</u>

At various points in the course of this adversary proceeding Matrix has asserted a veritable farrago of differing defenses.  In order to pin down precisely the points of contention between the parties, the Court requested both sides to submit post-trial briefs and reply briefs setting forth definitively the claims and defenses upon which each side relies.   Upon reviewing Matrix' post-trial brief, fearing that the parties may have misunderstood this instruction, in a conference call on the record on January 8, 2007 I ordered Matrix to submit a supplemental post-trial brief substantiating in fact and law any defenses omitted from its post-trial brief and reply, with the Trustee to respond on a schedule to be agreed by the parties.  I also ordered Matrix' counsel to specify precisely by street address each asset which Matrix argues the debtors could not have delivered and the evidence in the record supporting such assertion, and the Trustee to reply with respect to each such asset.

I shall address all of the points raised by Matrix' counsel in Defendant's Post-Trial Memorandum, Defendant's Post-Trial Sur-Reply Brief and Defendant's Supplemental Post-Trial Brief, upon the assumption that any arguments previously made but not set forth in these post-trial submissions have been waived.

Before turning to specific defenses, it will be useful to address a basic misconception which appears to be a premise of the defense. Matrix argues in heading I. of its Post-Trial Memorandum that:

> The Uncontroverted Evidence Introduced at Trial Clearly Proves that the Plaintiff did not Satisfy the Conditions Precedent and *Therefore Cannot Prove that Matrix Breached the Sales Agreement* (emphasis supplied)

Under this general heading Matrix sets four sub-headings of specific alleged "Conditions Precedent" and a fifth heading of "Other Conditions Precedent." Each of these points will be discussed separately below.

Preliminarily, however, it must be observed that this purported "defense" is fundamentally flawed both conceptually and legally. Conceptually, the question of whether the debtors did or did not fulfill conditions precedent under the Contract is quite distinct from the separate and different question of whether Matrix repudiated and thereby breached the Contract. A breach by the debtors may or may not have some consequence, either as to liability or damages. But the fact (if it were a fact) that the debtors failed to perform some duty or obligation under the Contract does not mean that Matrix did not repudiate and thereby breach the Contract. Moreover, Matrix' argument that the debtors failed to perform under the Contract and that this failure nullifies Matrix' repudiation is legally defective because, under the case law cited and quoted at length in points I.B and C, above, a breach of contract by one party that precludes performance by the counter-party relieves the counter-party of its obligation to perform, or to prove that it could have performed where, as here, it cannot be known whether performance would have been possible.

Matrix' central argument — that the debtors could not perform their part of the bargain — is addressed in points II.A and B immediately below. Each of Matrix' other affirmative defenses will be considered under points II.C *et seq.* that follow.

A.    **The divisibility of the Contract**

Matrix argues that the Contract was indivisible, and that a partial breach should be treated as a breach of the entire Contract. Thus, it asserts, if the debtors failed to perform any aspect of the Contract, Matrix should be entitled to cancellation of the entire Contract and refund of its deposit.

The nature and terms of a contract, as well as the parties' intentions, determine whether a contract is divisible. *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 81 (2d Cir. 1996) (citations omitted). Matrix argues that the Contract is indivisible because it had no allocation of the purchase price, there was only one closing date, and partial performance would be impossible. Likening this transaction to a deal for machine equipment, Matrix thus concludes that the failure of any piece of the Contract dooms the remainder in its entirety.

However, Matrix' argument overlooks fundamental elements of this Contract. This was not an all-or-nothing contract, rather it involved numerous discrete risks. This was a purchase from bankrupt companies owned and previously operated by two brothers known to be of dubious character and integrity who pleaded guilty to and are now in federal prisons for tax fraud. The sale was governed by a Bidding Procedures order that contained sweeping disclaimer statements, as did the Offering Memorandum. Sections 3.14 and 3.15 of the Contract expressly provided for credits to Matrix from the purchase price in the event the debtors would be unable to deliver the properties. The parties incorporated the possibility, indeed the likelihood of part performance into the Contract terms.

Moreover, Matrix continued to perform despite the failure of parts of the Contract. The Contract was signed on April 18, the same date on which four lease extensions under Section 3.13 ostensibly became due. Matrix' principal knew when he signed the Contract that the lease extensions had not been obtained and might never be obtainable. Even though the extensions were not delivered, Matrix did not treat the Contract as breached, as it would if the Contract were indivisible. Rather, with the knowledge of Matrix' principals Nelson and Nieto, Krischer continued to actively work with the debtors to obtain the lease extensions, and he personally worked with at least three of the landlords long after April 18. Krischer's April 27 email to Nelson admits that three of the landlords "will most likely not give us extensions until we are in, and there is a very good chance that at least 2 of them never will." Yet Matrix went forward on the Contract. In a May 10 email to all parties, Krischer announced "we have retained the law firm of Kera, Graubard & Litzman to represent us in the upcoming closing." That same day, Krischer emailed Dunkin' Donuts confirming that Matrix' "attorneys are still finalizing the [ZPG] partnership agreement." Matrix' actions waived any claim that obtaining the extensions was a drop-dead

issue, and unambiguously demonstrated that Matrix did not consider the Contract to be indivisible.

Obtaining the lease extensions was only a component of the larger purchase and sale agreement.  Failure

to obtain any of the four extensions did not doom the entire $26,770,000 deal.

Each store could be and was individually valued.  Section 3.14 of the Contract entitles

Matrix to $750,000 if the lease extension for the store at 392 East 149 Street was not delivered.

Section 3.15 entitles Matrix to a credit of up to $1,000,000 for the store at 38 Mill Road.  The 2002

Settlement Agreement also notes that Dunkin' Donuts has a specific business evaluation formula for each

store, should delivery become impossible.

Krischer confirmed this divisibility in his correspondence with Dunkin' Donuts.  On

April 27, 2005, when Dunkin' Donuts' attorney requested an allocation of the purchase price, store by

store, Krischer replied that he could readily supply one.  Thereafter, Matrix furnished a spreadsheet

(included in an exhibit in evidence) that specifically allocated the value of each of the several stores to the

exact dollar amount.  Matrix attributed a price tag to each store and contemplated the unique value of

each of the premises.  The stores were severable.  If a few premises become impossible to deliver, and

that failed delivery does not affect the preponderance of what is contracted for, the seller remains entitled

to enforce the contract with a diminution in its purchase price.  *See, e.g., Columbus Ry., Power & Light

Co. v. City of Columbus*, 249 U.S. 399, 411–12 (1919).  The buyer, however, is not released from its

responsibilities under the contract.  *See Benefit Concepts N.Y., Inc. v. Benefit Sys., Inc.*, 1992 U.S. Dist.

LEXIS 3811, No. 93 Civ. 1961, 12–13 (S.D.N.Y. Mar. 28, 1995).

Rather than machinery parts, which necessarily depend on each component for the unit to

function, this Contract contemplated twenty-four separate parcels of real estate in nine different cities (not

including the three "shops not yet opened").  There are nine stores in Yonkers, five in White Plains, three

in the Bronx, two in Scarsdale, and one in Harrison, Pleasantville, Eastchester, Hartsdale, and Goldens

Bridge.  The failure of one does not forestall performance on the others.  While the bakery plays a central

role to the franchise, Matrix' claim that the bakery could not be delivered is entirely incorrect, as is

discussed in point II.C below.  The parties made independent valuations and thus intended the Contract to

be divisible if necessary.  The debtors would have been able to substantially perform under the Contract,

even if their performance had been fully due upon Matrix' repudiation on June 10, which it was not.  If

the debtors had been unable to deliver all twenty-eight properties, that might bear on the question of

damages.  But it certainly would not entitle Matrix to repudiate its obligation to purchase the great

majority of the assets under the Contract, which the debtors were indisputably ready, willing and able to

deliver.

> **B.**      **The debtors' alleged inability to deliver certain assets**

Shorn of generalities and rhetoric,[7] Matrix argues that the debtors could not deliver the

following assets:

> 392 East 149 Street
> 38 Mill Road
>
> 53 Spencer Place
> 42 Lake Street
> 260 Halstead Avenue
> 195 East 161 Street
>
> 200 Westchester Avenue
> 987-A Central Park Avenue
> 307 South Broadway
>
> 2620-1/2 Central Park Avenue
>
> The Commissary Bakery

Let us examine the facts with respect to each of these assets.

**392 East 149 Street** and **38 Mill Road** are the stores listed in Sections 3.14 and 3.15 of

the Contract which provide for reductions in the purchase price in the event of the debtors' failure to

deliver leases or lease extensions on these two properties.  The non-delivery of these assets was con-

templated and accounted for in the Contract.   There could be no breach or contractual failure to perform

by the debtors in respect of these two stores.

**53 Spencer Place, 42 Lake Street, 260 Halstead Avenue** and **195 East 161 Street** are

the four shops referred to in Section 3.13 of the Contract, which required the debtors to deliver written

lease extensions prior to closing.  As noted above, Krischer continued to work with the debtors and the

---

[7]      For example, the argument that the debtors could not deliver "clear title" to thirteen of the shops.  *See* footnote 6, above.

landlords at three of the four locations to obtain lease extensions, and he emailed to Nelson the opinion

that none of these lessors would probably agree to extend their leases until "after we are in" and that two

probably never would.   Nevertheless, Matrix never declared a default under Section 3.13 and continued

to work on these locations until Dunkin' Donuts' May 25 letter advising that Matrix had contracted to pay

too much for the franchises.   In fact, the debtors did obtain lease extensions on two of these properties,

42 Lake Street and 260 Halstead Avenue.  The remaining two stores, 53 Spencer Place and 195 East 161

Street, were delivered to TBG without lease extensions.

**200 Westchester Avenue, 987-A Central Park Avenue** and **307 South Broadway** were

the three "shops not yet opened."  As already noted, the debtors had no obligation under the Contract to

conduct any further construction, obtain permits or perform any work or do anything whatever with

respect to these three shops not yet opened other than to deliver "as is" whatever interests the debtors had

in those assets.   The debtors held a Dunkin' Donuts franchise contract and a lease in respect of 987-A

Central Park Avenue.  There is no dispute that the franchise and the lease for this location could have

been conveyed to Matrix in accordance with the Contract.  The fact that at one time a building permit had

been denied (a matter of public record) is not germane to the debtors' ability to deliver the lease and

franchise agreements.  It would obviously be up to Matrix to apply for a building permit if they chose to

do so, whether a building permit had previously been granted or denied to a different applicant on a

different building plan.  As to the 200 Westchester Avenue location, the debtors had a lease but, as

disclosed in the Offering Memorandum, no franchise agreement.   There is no dispute that the debtors

could have delivered the lease in accordance with the Contract.   Matrix points out that 987-A Central

Park Avenue and 200 Westchester Avenue were not conveyed to TBG, but the TBG contract, unlike the

Matrix Contract, did not require TBG to purchase locations, such as these two, which were related to

Gianopolous' entities.   Accordingly, in April 2006 the Trustee rejected these two unexpired leases,

having no market for them. At the time of the Contract, the debtors had both a franchise agreement and a

lease for 307 South Broadway.  Subsequent to April 15, 2005, Taco Bell, the lessor, commenced a

proceeding in this Court for a determination that the debtor-lessee had previously breached the lease

entitling Taco Bell to terminate the lease.  The Court sustained Taco Bell's position.  That left the debtors

with the remaining asset, a franchise agreement for the location which could have been transferred to a new location. Debtors' counsel offered to negotiate with Dunkin' Donuts on Matrix' behalf to transfer the franchise to a new location or, in the alternative, for a credit against the Contract purchase price. Matrix declined both alternatives. But the debtors' obligation to deliver "as is" the transferable franchise for 307 South Broadway was not breached by the loss of the lease for that asset.

**2620-1/2 Central Park Avenue** is discussed at length in point II.J, below. Suffice it here to state that the debtors were ready, willing and able to deliver this location to Matrix under a month-to-month lease, which is what the debtors had. This asset was conveyed to TBG under the month-to-month lease. Matrix' objection as to this location is that a schedule in the Offering Memorandum listed 2620-1/2 Central Park Avenue as having a lease expiring September 30, 2013, which was in error. As amplified in point II.J, below, the debtors' obligation was to deliver its assets "as is" with numerous explicit disclaimers. Matrix could have discovered before April 15, and did discover within a few weeks after April 15, that the termination date of September 2013 was a mistake. Under these circumstances, the debtors cannot be held in breach of the Contract by reason of this inadvertent error in the Offering Memorandum. In any event, at most the error would give rise to an issue regarding damages.

**The Commissary Bakery** is dealt with in point II.C, immediately following. Suffice it to say that the debtors unquestionably could have delivered the Bakery in accordance with the Contract. As the evidence showed, the only reason that the Bakery has not yet been conveyed to TBG is that the TBG contract contained a provision precluding delivery of any asset in which the Gianopolous' brothers had any interest, and a Gianopolous entity is the landlord for the Bakery. The Matrix Contract did not contain a no Gianopolous connection provision such as that in the TBG contract.

What then remains of Matrix' central argument that the debtors could not perform their obligations under the Contract? Almost nothing.

Two of the shops, 392 East 149 Street and 38 Mill Road, were covered by Sections 3.14 and 3.15 of the Contract, and failure to deliver those assets could not breach the debtors' obligations under the Contract. Lease extensions under two of the four Section 3.13 locations were in fact obtained. The debtors were in fact able to deliver the assets that they had on an "as is" basis with respect to the

three shops not yet opened.  And the debtors unquestionably could have delivered the Commissary

Bakery and, on an "as is" basis, the franchise and month-to-month lease for 2620-1/2 Central Park

Avenue, although the debtors did not have a lease extension to September 2013 as erroneously reflected

on the Exhibit E spreadsheet in the Offering Memorandum.

    The bottom line is that the trial evidence compels the conclusion, and I so find, that the

only assets which the debtors arguably were unable to deliver in accordance with their obligations under

the Contract were lease extensions for two of the stores referred to in Section 3.13 of the Contract, 53

Spencer Place and 195 East 161 Street (both of which were delivered to TBG without lease extensions), a

lease extension to September 2013 for 2620-1/2 Central Park Avenue, which was not expressly required

under the Contract but which was erroneously referred to as extant on Exhibit E in the Offering Memo-

randum, and the lease for one of the three shops not yet opened, although the franchise for this address

could have been delivered and transferred to a new location   But as to the lease extensions for these three

assets, one must refer back to the legal principles expounded in points I.B and C, above.  Matrix'

repudiation of the Contract in June 2005 foreclosed the future and precluded the debtors from obtaining

lease extensions for these three shops.  Matrix' repudiation deprived the debtors and their professionals,

soon thereafter replaced by the Trustee, of literally millions of dollars in excess of the amount necessary

to pay all creditors in full.[8]  With financial resources vastly in excess of the values inherent in any of the

three leases in question, and in the absence of any evidence in the trial record of facts demonstrating or

suggesting that any of the three landlords would have declined lease extensions at any price, it appears

more likely than not that the Trustee could have negotiated lease extensions if the alternative were to lose

a $26.77 million Contract.

    As a matter of law, the debtors were relieved of their obligation to prove that they had the

ability to obtain these three lease extensions, because Matrix' repudiation deprived the debtors of that

ability.  The party which preemptively breaches a contract and thereby precludes the counter-party from

---

[8]   The Matrix Contract at $26.77 million exceeded the TBG contract by almost $9 million, and the amount the
Trustee will ultimately receive under the TBG contract will be far less than $18 million by reason of
provisions in the TBG contract not found in the Matrix Contract.

rendering its performance cannot look to the counter-party's lack of performance to exonerate its own breach of contract.

One further point must be made with regard to the debtors' failure to deliver lease extensions on these three stores. Nothing in the Matrix Contract provides that any of the lease extensions constituted a condition precedent to the obligations of Matrix to close. Only Section 7.1 of the Contract recited conditions precedent that would entitle a non-defaulting party to terminate the Contract. Section 7.1 listed only Sections 4 and 5 as provisions non-compliance with which would entitle a party to declare a default. In short, nothing in the Contract justified Matrix' repudiation of the Contract in June 2005.

As shown in point II.A, the Matrix Contract was divisible such that the debtors' inability to fully perform did not entitle either party to repudiate the Contract as a whole. The debtors' inability to deliver lease extensions on three shops may or may not be germane to the issue of damages, but it did not entitle Matrix to repudiate the Contract.

### C.  The CPL and the CO for the Bronx Donut Bakery

Little need be said of Matrix' contentions regarding the debtors' purported inability to obtain a commissary production license ("CPL") from Dunkin' Donuts or a certificate of occupancy ("CO") for the Bronx Donut Bakery.

The fact is that a CPL was issued by Dunkin' Donuts to Sunapee Food Services LLC, a Gus Company which was the corporate predecessor of Bronx Donut Bakery Inc., the Tom Company which is now a debtor. There was no trial evidence that the Sunapee CPL is no longer in full force and effect. Any issues between Dunkin' Donuts and the debtors relating to the Bakery were resolved in negotiations between Dunkin' Donuts and the Chapter 11 Trustee, as shown in the testimony of Dunkin' Donuts' counsel cited and quoted at pages 6-8 of Plaintiffs' Post-Trial Reply Brief.

The trial evidence also showed that a CO was issued in 1975 covering the premises on which the Bronx Donut Bakery has operated at all times, as successor to Sunapee, and no evidence was presented by Matrix suggesting that the CO has ever been withdrawn. In fact, the Bronx Donut Bakery has at all times prior to and during these bankruptcy proceedings to date been operated as the bakery

supplying product to all of the debtors' Dunkin' Donuts franchise shops including those which have been sold to TBG.

**D.      Assumption of the 2002 Settlement Agreement**

Matrix asserts that "It was the Debtors' responsibility to assume the October 2002 Settlement Agreement which operated as the functional equivalent of the franchise agreements which comprised the bulk of the sale of the assets in this case."  From this baseless premise, Matrix argues that the debtors had various obligations to "cure" and that the debtors failed to effect the supposedly requisite cure.

The debtors were not parties to the 2002 Settlement Agreement.  Indeed, it does not appear that the debtors even existed as corporate entities at the time of the 2002 Settlement Agreement. Nor can it possibly be said that the 2002 Settlement Agreement was "the functional equivalent of the franchise agreements," and Matrix has offered no rationale or explanation for this groundless assertion.

The 2002 Settlement Agreement was certainly a factor that loomed large in the debtors' bankruptcies because of the Mandated Franchise Sales provision under which Tom, a signatory to the 2002 Settlement Agreement and owner of the Tom Companies which became the debtors, had an obliga-tion to sell the debtors' franchises by mid-2005, failing which Dunkin' Donuts had the right, in substance, to take back the franchises at a price determined under its own formula and convey the franchise rights to others.

But the debtors were not parties to the 2002 Settlement Agreement, and the concepts of assumption and cure with respect to that Agreement are simply not relevant.

Of course, the debtors were parties to franchise agreements with Dunkin' Donuts, and the debtors had obligations to cure with respect to those agreements, as fully disclosed in the Offering Memorandum.   But any obligations to cure which the debtors may have had under the franchise agree-ments ran to Dunkin' Donuts, not to Matrix, and Dunkin' Donuts never objected to the Matrix Contract or to transfer of the franchises to Matrix on the grounds that the debtors were in default of any obligation to cure.

The debtors' obligations to Matrix were only those that arose under the Matrix Contract. Putting aside the shop remodel obligations, discussed below, the debtors' cure obligations owed to Dunkin' Donuts were all resolved between the debtors and Dunkin' Donuts and were of no concern to Matrix.

E.    **The shop remodeling obligation**

Before signing the April 15 Contract, Matrix became aware that Tom and Gus had not remodeled certain stores in accordance with Dunkin' Donuts' franchise requirements and that Dunkin' Donuts would require Matrix to remodel those ten stores upon acquisition.  As of April 15, Matrix apparently had not done its due diligence as to the exact number of stores to be remodeled or hoped it could limit the requirement to four or five stores.  Matrix also hoped that it would be able to keep the stores open during remodeling, which Dunkin' Donuts forbade.

Matrix now argues that such remodeling requirements were not covered under the broad disclaimers because they are new obligations on Matrix, rather than store conditions subject to the "as is" clause, and therefore Matrix need not assume those costs.  This argument fails because the "as is" dis-claimers cover Matrix' obligations and because Matrix repeatedly acknowledged that it, not the debtors, bore the obligation for the remodeling.

Matrix is correct that Section 5.6 of the Contract does not require Matrix to assume new obligations unless explicitly written.  However, the remodeling requirements were not new obligations. They were old requirements that Tom and Gus failed to perform and that passed on to the purchaser at acquisition.  The exact details of which and how many stores required remodeling were all available to Matrix in the Franchise Agreements and the Level II Due Diligence materials prior to their decision to sign the Contract.  If Matrix' principals or Krischer felt that Dunkin' Donuts did not provide enough information prior to signing the Contract, they didn't have to sign it.  The information was there.  Matrix simply hoped that when they got around to reading it, it would be as favorable as they wished.

Matrix clearly understood that it, and not the debtors, was responsible for the remodeling. Krischer explicitly acknowledged this in his April 27, 2005 email to Dunkin' Donuts, stating:

I believe this paragraph talks to the actual remodeling of some of the existing restaurants. We have always been told it was a few, 4 or 5, and we have also always been told that we would be required to do these remodels, which we agreed to do. We were never told that the stores may have to be closed from the takeover until the stores are actually remodeled… .

No where [*sic*] in our agreement between us and the sellers (which as we all know has been approved by the court and other interested parties) does it say anything about us having to close stores upon takeover until we complete any remodel.

Doing so would obviously cause a financial burden, which will not be borne out by the buyers. This is something that has to be satisfactorily worked out between the sellers and Dunkin'.

The same paragraph says we will have to show we have sufficient reserves to pay for the remodels, we are prepared to do so, please advise. As far as getting the stores remodeled as quickly as possible, we absolutely see the benefit in doing so and we are prepared to start the process ASAP. After visiting all the locations, we acknowledge that we will be spending much time, energy and money cleaning up and sprucing up ALL the locations, even the ones that don't require an immediate full or partial remodel. We clearly understand how that is necessary to enhance and maintain brand equity and maximize a store's profits!

In an April 30 email to Dunkin' Donuts, Krischer similarly acknowledged that Matrix was willing to go forward on its obligation to remodel, stating

From what I could read at least 5 of the 10 shops you are talking about were due to be remodeled in 2003 and 2 more in 2005. As I said in my previous correspondence to you, my company has every intention of doing these remodels and construction of shops, we (Dunkin and my company) just have to come up with a schedule that is equitable and fair to both of us.

Matrix knew that it bore the obligation to remodel. It just hoped that there would be fewer stores, or regretted not having discovered how many before signing the Contract.

Matrix' defense that they performed "substantial" due diligence does not entitle them to back out of the obligations they assumed. Substantial due diligence can still be insufficient. The broad "as is" disclaimers, including Exhibit N, explicitly mention the remodeling requirements and that the purchaser could not rely on any alleged representations without conducting its own investigations.

The issue of closing the stores during remodeling was the subject of numerous negotiations between Matrix and Dunkin' Donuts. Despite its original position and Matrix' contractual obligations, Dunkin' Donuts was willing to allow Matrix to stagger its remodeling over time, as explained above (point (g)). But Dunkin' Donuts still required the stores to close during their remodeling, and

Matrix failed to account for the lost revenue during that time.   It was only during Matrix' May 17, 2005 meeting with Dunkin' Donuts that they finally realized that the stores would have to remain closed.  Only then did Matrix realize the extent of the remodeling and the revenue they would lose during the store closures.

What emerges is that despite having access to all the information they sought prior to signing the Contract, Matrix failed to discover the details of its obligations until after signing the Contract.  The Contract indicated that because the stores were past due in their remodeling obligations, the debtors made no warranties and Matrix accepted all properties "as is."  Matrix knew that "as is" applied to its obligation to remodel, as evidenced by Krischer's emails.   It was only later that Matrix realized the extent of the remodeling, the lost revenues it would face during the closures, and that Dunkin' Donuts considered Matrix' purchase price to be too high.  Only then did Matrix begin to feel buyer's remorse.

### F.    <u>The argument that Matrix did not repudiate</u>

As discussed above, Matrix wrote in its June 10 letter, "we respectfully request a cancellation."  It wrote that future negotiations would be "pointless."  It declared its refusal to go forward in open court.  *See* point (h) under The Facts and point I.B, above.

Matrix now contends that it did not repudiate since any modifications must be in writing and "any alleged oral statements" are insufficient.  But Matrix' repudiation was in writing in its June 10 letter.  Its oral repudiation was in open Court on June 29, 2005, and those alleged oral statements are preserved for posterity on the official Court record.  Matrix cannot now backpeddle from its own public declarations.  Even if a termination is considered a modification, the June 8 letter is in writing.  Matrix repudiated both orally and in writing; it had no intention of honoring its obligations.

Matrix claims that it declared that it was the debtors that were in default "having realized the debtors could not perform."  But the debtors were never in default and never wavered in their declared intention to perform under the Contract.  *See In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 526 (Bankr. S.D.N.Y. 2005).  It requires more than an intuitive "realization."  The debtors' requests to renegotiate when Matrix threatened to and then did renege were not in any way a rejection of the Contract by the

debtors or a declaration of inability to perform.  If Matrix doubted the debtors' ability to perform, Matrix

could have demanded assurances.  But it was not free to abdicate its duties.  Matrix did not declare the

debtors in default.  It declared its own default.

### G.   The argument that a closing was not set and Matrix still had time to cure

Matrix argues that a closing date was not set, and that even if one was, it still had time to

cure its repudiation.  Matrix also argues that it was entitled to cancel the Contract because the debtors

would not be able to perform by the closing date.  The inconsistency of these positions is obvious.

Matrix' affirmative defense is based on the very opportunity to cure that it denies the debtors.  The parties

may have been hoping for a  July 31 closing date, based on the 2002 Settlement Agreement.  Matrix'

June 10 repudiation left an additional 51 days until July 31 to perform.  The 2002 Settlement Agreement

even provided that the closing date could be extended if the parties were working toward closing in good

faith.  The debtors were willing to proceed and were working diligently to obtain the lease extensions

until and even after Matrix' June 10 repudiation of the Contract.  But Matrix' repudiation was definitive

and it was final.

### H.   Dunkin' Donuts' rejection of Krischer

Matrix argues that since Dunkin' Donuts conditioned its approval on Matrix finding a

replacement for Krischer, that Dunkin' Donuts actually rejected Matrix.  Dunkin' Donuts' June 8 letter

stated, "We would be willing to accept [Nelson and Nieto] if they brought in a new principal…"  Matrix

also argues that since Dunkin' Donuts required a new principal, it required Matrix to "reconstitute its very

corporate essence."  Additionally, Matrix claims that there is no assurance that Matrix could ever offer

someone that Dunkin' Donuts would accept.

This defense is no defense at all.  It certainly does not justify Matrix' repudiation and was

not proffered as a justification at the time.  The June 29 hearing was scheduled to determine the

reasonableness of Dunkin' Donuts' rejection of Krischer.  Matrix appeared at that hearing solely to

repudiate the Contract, regardless of whether Krischer was properly rejected.  In other words, even if the

Court ordered Dunkin' Donuts to accept Krischer, Matrix still rejected the Contract.  As Matrix' then

counsel stated, "So it's kind of irrelevant whether Mr. Krischer is acceptable or not because they just did

not want to pursue this deal any further." Nieto also stated "it's moot to have this big effort as to whether [Krischer] is properly rejected or not when I think everybody knows we're not going through with the deal." Matrix cannot now use Dunkin' Donuts' rejection of Krischer as grounds to justify its pre-planned repudiation.

Matrix' representation of Dunkin' Donuts position is also incorrect. As discussed above, in its June 8 letter Dunkin' Donuts approved everything about Matrix except its proffer of a confessed felon as operating manager. At the June 29 hearing, this Court ruled that Dunkin' Donuts' conditional approval was entirely appropriate. As a practical matter, the effect of Matrix' position is that the Dunkin' Donuts' June 8 letter created an option for Matrix, whereby Matrix could choose to find a replacement if it wished, which would bind the debtors to the Contract, or alternatively Matrix could choose not to submit anyone new to Dunkin' Donuts and thereby allow the Contract to fall by the wayside.

That position is untenable. Dunkin' Donuts' June 8 letter did not create an option at Matrix' sole discretion. Section 1.4 of the Matrix Contract requires Matrix to "use its best efforts to provide, to the satisfaction of . . . Dunkin' Donuts . . . adequate assurances of future performance." Matrix was contractually obligated to use its best efforts to meet Dunkin' Donuts' requirements. It was entirely reasonable for Dunkin' Donuts to require that Matrix present a non-felon to run its franchises. In addition to the express Contract "best efforts" provision, every contract also implies a duty of good faith and fair dealing, which Matrix breached by not seeking to find a suitable replacement for Krischer.

Matrix' counsel argues that Matrix presented someone else for Dunkin' Donuts to consider. However, the sworn testimony of both Nelson and Nieto refutes that notion. At trial, Nelson admitted that Matrix did not present anyone else to Dunkin' Donuts.

> Q.    When Mr. Krischer was not approved by the June 8th by Dunkin' Donuts, Matrix didn't do anything to replace him did they?
>
> A.    Absolutely not. No.
>
> Q.    They didn't take a single step?
>
> A.    Well --
>
> Q.    It's a Yes or No answer.  You didn't take a single step?

A.    No, we did not, sir.

Similarly, Nieto acknowledged in his testimony that Matrix was unwilling to find a substitute for

Krischer.

Q.    Would you go forward with this deal without Krischer?

A.    I don't think we would be able to do that, no.  Our whole interest was always
predicated on his involvement in the deal . . . So without Dan, we wouldn't have
the interest or the capability of taking care of this, and we don't really want, we
don't feel we have an obligation to go try to find somebody else who we are
going to trust on a $20 million asset.

In short, Matrix did not feel it had an obligation to satisfy its express "best efforts" ob-

ligation under Section 1.4 of the Contract, or its implied obligation of good faith and fair dealing.

Matrix' corporate restructuring argument is also flawed.  Krischer was not a principal,

officer, director, or shareholder of Matrix.  He was not a part of its corporate structure.  He was a hireling.

Dunkin' Donuts did not address Matrix' corporate structure, it wanted a different liaison between itself

and Matrix.  If Dunkin' Donuts wanted the liaison to be a "principal," Matrix could satisfy this request

through its ZPG sub-entity.  That is precisely what Krischer's May 10 email to Dunkin' Donuts stated:

"Our attorneys are finalizing the partnership agreement between my partners, Glen Nelson and Richard

Nieto and myself. . . .  We will have an LLC and all the locations we will be under an 'Umbrella' LLC.

Ownership is divided 37.5% Glen Nelson, 37.5% Richard Nieto and 25% for Dan Krischer."

Despite its claim, Matrix did not have to reconstitute its very corporate essence.  Matrix'

claim implies that Dunkin' Donuts' requirements were unreasonable and therefore Matrix was not bound

to comply.  Yet Dunkin' Donuts' requirements were reasonable, and Matrix bound itself to those require-

ments by signing the Contract.

Throughout the transaction, Matrix contemplated that the stores would be held in a new

special purpose entity named ZPG or some other name, which was to be 75% owned by Matrix' princi-

pals.  Dunkin' Donuts reasonably required Matrix to find a new manager and compensate him with an

equity interest in the new entity (not with an equity interest in Matrix), presumably as an incentive and to

guarantee accountability and continuity in operating the stores.  With only a minority interest, this mana-

ger would still be subject to the direction and control of Matrix' principals Nieto and Nelson.  Under

Section 1.4 of the Contract, Matrix obligated itself to use best efforts to find a manager acceptable to

Dunkin' Donuts.  Dunkin' Donuts simply called for an honest, capable, responsible manager to operate

the Dunkin' Donuts franchise stores.   As confirmed by both Matrix principals, Matrix made no effort at

all to comply.

The evidence makes clear that the issue for Matrix was not Krischer — it was economics.

Krischer was a hired man, replaceable like any hired person.  As Matrix' counsel and its principal Nieto

said at the June 29 hearing, "it's kind of irrelevant whether Mr. Krischer is acceptable or not because they

[Nieto and Nelson] just did not want to pursue this deal any further," and "it's moot to have this big effort

as to whether [Krischer] is properly rejected or not when I think *everybody knows we're not going*

*through with this deal*" (emphasis supplied).

## I.    <u>The argument that the Dunkin' Donuts' Rider was not yet signed</u>

Matrix argues that "Dunkin' Donuts' approval was conditioned upon the receipt of the

executed rider," referring to a document titled "Rider to Contract for Sale" (the "Rider").

The short answer to this argument is that the Rider is not referred to in nor is it a part of

the Matrix Contract, and it was not a condition precedent under the Matrix Contract.   The Rider was a

Dunkin' Donuts document.  It was Dunkin' Donuts' policy to require an executed copy of the Rider at

some point prior to the sale of a franchise.   Failure to provide the Rider might perhaps have been a

ground for Dunkin' Donuts to withhold approval of the transfer, or Dunkin' Donuts might waive the

requirement.   But this is rendered moot by Dunkin' Donuts' actual approval of Matrix, subject to Matrix

using good faith to hire a moral and capable operations manager.

It is clear from the trial testimony of Dunkin' Donuts' counsel that time was not of the

essence for the furnishing of an executed Rider, and the fact that a Rider had not been completed when

Matrix repudiated the Contract in June 2005 was never mentioned by Dunkin' Donuts as an obstacle to its

approval of the Matrix Contract.   Indeed, the Rider in respect of the sale of the debtors' franchises to The

Beekman Group was not delivered to Dunkin' Donuts until the day of the closing, without objection by

Dunkin' Donuts.  The Rider for the Matrix Contract was in preparation before Matrix' June 10 repudia-

tion.  Since final preparation and execution of the Rider could have been completed by the time a closing

date was set, and Matrix' anticipatory repudiation foreclosed that possibility, Matrix may not claim that non-delivery of the Rider by June 10 justified its repudiation.

### J.    Fraud in the inducement

Matrix argues that it was fraudulently induced to sign the Contract by an Offering Memorandum that misrepresented certain facts.  Throughout its trial submissions, Matrix alludes broadly to misrepresentations, yet it articulates only three.  First, that a lease extension to 2013 was in place for the store at 2620-1/2 Central Park Ave.  Second, that the debtors had a leasehold interest in the 307 South Broadway store.  Third, omitting that a permit was denied for building the shop not yet opened at 987-A Central Park Ave.

The only place in the Offering Memorandum that addressed leases for the various locations was in Exhibit E at the end of the Offering Memorandum.  Exhibit E, titled "Franchise and Lease Expiration Dates (h)(i)" contains a chart, not text.  It lists all twenty-four operating stores, the bakery, and the three "shops not yet opened."

The fourth row down lists 2620-1/2 Central Park Ave.  In this row, under the sixth column, titled "Lease Expiration Date w/ Options," appears the date 9/30/2013.  This date, an error, represents that an extension was in place when, in fact, the lease was only month-to-month.  The month-to-month lease was successfully conveyed to TBG in December.

The twenty-eighth row down is for 307 South Broadway, the "Taco Bell location," a shop not yet open.  Under the sixth column appears the date 10/31/2023.  This date, an error, also represents that an extension was in place when, in fact, none was.

At a May 24, 2005 hearing, the lease for the Taco Bell location was deemed to not be property of the estate.  However, under the fourth column, titled "Franchise Agreement Expiration Date," appears the date 7/31/2015.  This date indicates that the estate did own the valuable right to a Franchise Agreement with Dunkin' Donuts that it was able to convey, which Matrix did not challenge.  A footnote on the chart also indicates that "Dunkin' Donuts will extend the franchise agreement 10 years beyond the closing date."  Matrix was unwilling to negotiate relocating this valuable Franchise Agreement to another location, as discussed in point II.B, above.

As to Matrix' third alleged misrepresentation, the Offering Memorandum made no reference to a rejected building permit for 987-A Central Park Ave. There was no misrepresentation, however, because there was no statement concerning the building status anywhere in the Offering Memorandum. The Contract provided that the debtors had no building obligations for the "shops not yet opened," as noted above. Further, the status of any building permits was available as a matter of public record. Matrix could have and did discover this with due diligence, albeit after the Contract was signed.

These two errors and one omission are the only "misrepresentations" Matrix has identified in the Offering Memorandum. As to the two mistakes on the Exhibit E chart, the unprecedented disclaimers quoted in point (f) above specifically cover this exact scenario. As shown in point (f), there were prominently displayed disclaimers in the Contract terms, in the Bidding Procedures, and in the Offering Memorandum itself. In fact, there were disclaimers on the very page with the errors. The title of Exhibit E refers to footnotes (h) and (i). Footnote (h) reads "All financial data is per unaudited internal company records. The related tax returns have not been filed and FMG's books have not been reconciled." The bottom of that page contains another disclaimer, "Subject to the Conditions of Use referenced within the text of this report."

As discussed above, Section 1.5 of the Contract recites that all assets are to be conveyed "as is where is." No representations or warranties are made. Section 9.8 integrates the Bidding Procedures Order into the Contract. The paragraph from page 2 of the Bidding Procedures quoted in full in point (f) in the Facts section, above, expressly states that:

> Each bidder . . . shall be deemed to acknowledge . . . (c) that it had an opportunity to, or waived any right to, inspect and examine the applicable Lease and all other pertinent documents with respect thereto prior to making its Bid and that each such Bidder relied solely on that review and upon its own investigation and inspection of the Assets in making its Bid and (d) that the Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtors, their agents, representatives, consultants and/or attorneys.

With regard to the charts, the Bidding Procedures Order also recites that "all information and/or documentation provided to prospective Bidders (a) has been prepared for informational purposes only." Further, it "does not purport to be all-inclusive or to contain all of the information that a prospective buyer may desire. In all cases, interested parties should conduct their own investigation." The Offering

Memorandum also warns that no information has been independently verified.  It was known and
repeatedly made known to all parties that the Gianopolous' records were not reliable and that extensive
due diligence would be necessary, especially since their records had not been reconciled since 2003.

Matrix' argument that it was fraudulently induced is excluded as a matter of law.  The
Contract disclaimers are binding on Matrix and precisely cover this claim.  There were only twenty-eight
assets total.  Matrix was on notice that it had to obtain documentation for those twenty-eight stores and
verify that if a lease was represented on the chart, it should be corroborated with an actual lease extension.

Matrix' agent Krischer did in fact identify the two alleged misrepresentations and
omissions in the course of his post-April 15 due diligence — the failure to do so before signing the
Contract was at Matrix' own risk.  Despite its current contention, Matrix acknowledged that it assumed
this risk.  At trial, Krischer testified:

> Q.    Did you understand from the offering memo that whatever you were told by Mr.
>        Rattet or Keane or others, including the Debtors, was not something that you
>        could rely on in making your bid?  . . .
>
> A.    I absolutely thought I couldn't rely on it.
>
> THE COURT.   You thought you could have?
>
> A.    Thought I couldn't rely on it.
>
>                                    * * *
>
> Q.    Do you think it's reasonable for you to rely on statements made by the Debtors or
>        by the Debtors' advisor team, consultants, or others in light of the language in
>        this section that you read?
>
> A.    It's not a yes or no answer.
>
> Q.    Well, I'm asking you. Do you think it's reasonable?
>
> A.    I don't think it's reasonable.

The trial evidence wholly refutes Matrix' claim of fraud in the inducement both as a
matter of fact and law.[9]

---

[9]    Matrix' claim that it "relied" on unidentified misrepresentations in the Rider is equally baseless.  Work on
the Rider began after Matrix signed the Contract.  While the parties exchanged various drafts of the Rider,
Matrix concedes that the Rider was never put into final form or executed.

### K.    The fraudulent 64 East bid

Counsel argues that the Contract should be voided because Matrix was induced to increase its $16 million contract to $26.77 million (an increment of over 67%) by 64 East's fraudulent $21 million stalking horse contract. The argument borders on the ridiculous. Assuming that Matrix' final contract bid was motivated by the 64 East bid, so what? These debtors' estates and their constituency of creditors were not responsible for any infirmity in the 64 East bid, and this defense of "reliance" on representations outside the Contract is barred by the Contract itself.

Moreover, 64 East's bid did not force Matrix to aggressively outbid 64 East by $5.77 million, nor did it force Matrix to require a Court order to cancel the auction and declare Matrix the successful bidder. Any plaint Matrix might have had against 64 East does not annul Matrix' decision to increase its bid by almost 28% over 64 East and sign a Contract with the debtors.

Finally, the evidence compels the conclusion, and I so find, that Matrix' final Contract was motivated not by 64 East but by the prospect of a $24 million offer by TBG. Both Krischer and Nelson testified that they knew of the prospective TBG $24 million bid before submitting their $26.77 million bid. This also explains why Matrix did not incrementally bid to trump the $21 million bid, for example, by bidding $22 or $23 million. Rather, Matrix knew of and was induced by TBG's $24 million bid, regardless of 64 East's bid.

### L.    Impossibility/frustration of purpose

This defense is totally irrelevant to the facts here. The impossibility defense is reserved for extraordinary circumstances such as a building burning down or a ship's cargo sinking in Mid-Atlantic. *See e.g.*, *Taylor v. Caldwell*, 3 B. & S. 826 (1863). In such cases, an unexpected and totally unforeseeable supervening event frustrated the entire purpose underlying the contract. *See also* U.C.C. § 2-615 (1977). Even the outbreak of war may not be sufficiently unforeseeable. *See, e.g.*, *Peerless Cas. Co. v. Weymouth Gardens,* 215 F.2d 362, 364 (1st Cir. 1954) (increased costs caused by the unexpected outbreak of war do not release obligations of the contract).

Matrix argues that since the debtors could not deliver every store, the Contract's purpose was frustrated. The divisibility analysis in point II.A sets this argument to rest. This defense neither

applies nor excuses Matrix' breach.  Matrix accepted the risk of purchasing from a bankruptcy estate previously operated by the Gianopolous brothers.  The "as is" provision of the Contract and the extraordinary and pervasive disclaimers in the Offering Memorandum and the Bidding Procedures Order put all parties including Matrix on notice that the debtors might not be able to deliver some stores, and the Contract provided for credits in that event.  The debtors' alleged inability to deliver two of the four lease extensions mentioned in Section 3.13 was neither unexpected nor unforeseeable.  Certainly delivery of all the shops and their lease extensions was not a "basic assumption on which the contract was made."  RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981).

Finally, it should be noted that even if any of Matrix' assertions here were credible, the doctrine of Partial Impossibility would still require Matrix to perform on those stores where performance was not allegedly frustrated.  *See, e.g., Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Ia. 1991) (holding that when a substantial portion of the performance was still possible, the impossibility of performing some portion of the work did not release the defendant from the remainder of his contract); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 270 (1981) ("Where only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if it is still practicable for him to render performance that is substantial.").  *See* the analysis of divisible contracts under point II.A, above.

Of the twenty-four stores, four lease extensions, three "shops not yet opened," and commissary contemplated in the Contract, Matrix complains that two stores, the lease extensions, the "shops not yet opened" and the bakery certificates could not be delivered (the deficiencies in these claims are all addressed in point II.B, above).  Even if such alleged non-performance could be considered a frustration of purpose, the vast majority of the Contract still could be performed.  Matrix acknowledges that twenty-two of the twenty-four operating stores could be delivered.  As demonstrated above, the commissary and at least two of the four lease extensions could also be delivered, as well as credits for the two stores as per the Contract.  The debtors could have performed the substantial majority of the Contract.

### M.      The December 15 Order

To obtain Court approval of the sale to TBG and to avoid any possible argument that the

Matrix Contract or the earlier stalking horse contract with 64 East ("Borek") had not theretofore been

terminated, the Trustee filed an omnibus motion on November 18 for *inter alia* an "Order Determining

That The Debtors' Prior Contracts With Two Former Potential Buyers Be Deemed Null And Void" which

was signed on December 15 (the "December 15 Order").  This belt-and-suspenders Order precluded any

possible claim, however spurious, that either Matrix or Borek had any remaining Contract rights to the

debtors' assets which were being sold to TBG.

Matrix now argues at the eleventh hour that the December 15 Order "nullified" the Matrix

Contract, retroactively abrogated the debtors' breach of contract claims asserted in this adversary pro-

ceeding since July 2005, and released Matrix from any liability on account of its Contract repudiation.

The argument is frivolous.

The December 15 Order provided in its operative decretal paragraph:

> ORDERED, that the Debtors' prior agreements or contracts with two former
> potential buyers, Matrix and Borek be deemed terminated and of no further force or
> effect. . . .

Nothing in the December 15 Order purports to impair or affect any claims in this adversary proceeding.

Nothing in the December 15 Order purports to effect a release or abrogation of the debtors' claims against

Matrix.  And, of course, nothing in the omnibus motion even intimates that the Trustee intended or

contemplated that millions of dollars of pending and actively litigated breach of contract claims were to

be waived or released by the December 15 Order.

In stating that the Matrix Contract "be deemed terminated and of no further force or

effect" the December 15 Order did no more nor less than what common law recognizes as the conse-

quence of an anticipatory repudiation.  *See* the discussion and case law in point I.B, above.  As stated by

the Court in *In re Asia Global Crossing, Ltd.*, "If an anticipatory repudiation occurs, the non-breaching

party has two mutually exclusive options.  He may elect to treat the contract as terminated and exercise

his remedies, or continue to treat the contract as valid." 326 B.R. at 249.  In this case, Matrix declared

unequivocally in its June 10 letter and by its attorney and one of its principals at the June 29 hearing that

the Contract was terminated so far as it was concerned.  For their part the debtors and, subsequently, the

Trustee elected to treat the Matrix Contract as terminated and commenced this adversary proceeding to

enforce the debtors' remedies.  The December 15 Order did no more nor less than provide the contracting

parties to the TBG sale with the comfort of a court order providing expressly what both parties had de-

clared by their actions and the common law declared as a rule of law — that the Matrix Contract was

terminated.  It was terminated by Matrix' repudiation of its obligation to proceed with the sale, the

debtors' election to treat the Contract as terminated and sue for damages, which it did, and the

December 15 Order binding on all parties confirming that the Contract was, indeed, terminated.  But no

rule of common law, no conduct by the parties and nothing in this Court's December 15 Order purported

to abrogate, release, waive or otherwise impair the breach of contract claims which have been contested in

this Court since July 2005.

      The Trustee and Matrix have expended enormous effort and resources litigating the breach

of contract claim here decided through pleadings, arduous discovery, cross-motions for summary

judgment, other substantive motions *in limine*, a trial and two sets of post-trial submissions.  To argue for

the first time on the eve of trial that all this time, effort and expense was a gigantic waste of time and

money because an Order entered on December 15, 2005 should be construed *post hoc* as having nullified

the debtors' claims in this adversary proceeding surely ranks at the highest level of *chutzpah* in legal

advocacy.

    **N.**    **Failure to join ZPG as a necessary party**

      The argument that the adversary proceeding must be dismissed for failure to join ZPG as a

necessary party is also frivolous.  *See* point (e) in The Facts section, above.

## **Conclusion**

The debtors are entitled to judgment against Matrix on the issue of liability for breach of

the Matrix Contract.  Counsel for the parties are directed to confer together, agree upon and file a

Scheduling Order for a trial in November on the issue of damages.


Dated: White Plains, NY
     July 25, 2007

                       /s/ Adlai S. Hardin, Jr.
                                U.S.B.J.